969 A.2d 262

**Ronald Eugene JOHNSON**

v.

**STATE of Maryland.**

**No. 113 Sept.Term, 2007.**

Court of Appeals of Maryland.

April 8, 2009.

Mark Colvin, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for Petitioner.

Gary E. O'Connor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for Respondent.

Argued Before BELL, C.J., RAKER*, HARRELL, BATTAGLIA, GREENE, MURPHY and DALE R. CATHELL (Retired, Specially Assigned), JJ.

MURPHY, Judge.

In the Circuit Court for Anne Arundel County, a jury convicted Ronald Eugene Johnson, Petitioner, of possession of cocaine with intent to distribute, several other violations of the

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Maryland Controlled Dangerous Substance Act, and fourth degree burglary. The State's evidence was sufficient to establish that he committed those offenses in Annapolis, Maryland on April 12, 2005. Petitioner does not argue to the contrary. He does, however, argue that he is entitled to a new trial on the ground that he was unfairly prejudiced by the introduction of evidence that a drug-sniffing dog "alerted" to currency seized from his person incident to his arrest.

In an unreported opinion filed on October 3, 2007, the Court of Special Appeals affirmed Petitioner's convictions. *Johnson v. State*, No. 2473, September Term, 2005, 176 Md.App. 758. Petitioner then filed a Petition for Writ of Certiorari, in which he requested that this Court answer three questions:

1. Is evidence of a drug-sniffing dog's alert to currency (and, here, to the pants in which the currency was being carried) ever admissible in criminal prosecutions, and, if so, was it admissible under the circumstances of this case?

2. Did the Court of Special Appeals err in holding that the issue presented in Question 1 is not preserved for appellate review despite the fact that the trial court overruled Petitioner's objections and gave defense counsel a continuing objection?

3. Did the trial court err in allowing a canine officer to testify that, based on his test of currency drawn from a bank, the belief that most currency in general circulation is contaminated with drug residue and that a drug-sniffing dog, therefore, will always alert to currency is not a "legitimate" belief?

We granted the petition. 402 Md. 355, 936 A.2d 852 (2007). For the reasons that follow, we shall answer "yes" to each of Petitioner's questions, vacate the judgments of conviction and remand for a new trial.

As to question 1, we are not persuaded that the Circuit Court erred or abused its discretion in overruling Petitioner's objection to the testimony that the drug-sniffing dog "alerted" to Petitioner's pants and the currency found therein. As to

question 2, we agree with Petitioner that the arguments he presents to this Court have been preserved for our review. As to question 3, we are persuaded that error occurred during the direct examination of the canine officer when (1) the Circuit Court overruled Petitioner's objection to a question which included the assertion that "some people believe that most currency in general circulation is contaminated with drug residue ... even currency in a bank," and which asked the canine officer whether such a belief was "legitimate," and (2) the officer was permitted to opine that, based upon a "test" in which his dog did not alert to "currency drawn from a bank," such a belief is not a "legitimate" one.[1]

### Relevant Factual Background

The opinion of the Court of Special Appeals includes the following factual summary:

> Shortly before noon on April 12, 2005, [Petitioner] Ronald Eugene Johnson was spotted by Annapolis City Police Officer Christopher Kintop "fleeing on foot from [his] location on Copeland Street towards Royal Street." The officer saw [Petitioner] turn a corner but then lost sight of him.
>
> Approximately twenty minutes later, Kintop and other Annapolis police officers gathered at 900 E. Royal Street in front of a house where Shayila Allen resided. The officers, suspecting that [Petitioner] was inside, knocked on Allen's door and shouted, "Police department," whereupon [Petitioner] opened the second-floor bedroom window and demanded to know what the officers wanted. They told him to come outside. A few minutes passed, during which time there was "a bunch of commotion" coming from the bedroom where [Petitioner] had appeared. [Petitioner] then shouted from the window a second time at the police officers.

---

1. The transcript shows that the prosecutor asked, "was that a legitimate *lead?*" According to both parties, however, it seems clear that the prosecutor actually asked, "was that a legitimate *belief?*"

Seconds later, several officers entered the residence and apprehended [Petitioner]. The officers then proceeded to the second-floor bedroom where they found, strewn on the bed, a plastic bag containing 1.41 grams of marijuana, another bag containing 12 methamphetamine pills, and a small bottle containing 0.024 grams of PCP. Next to the drugs was a Nextel cell phone.

[Petitioner] was transported to the Annapolis police station and searched. Police found $845.00 in cash [in] his pants pocket, as well as a Motorola cell phone clip that fit the Nextel cell phone previously uncovered in the residence. The pants that [Petitioner] had been wearing were also seized.

Later that day, an Annapolis police dog named "Aries" was brought in to conduct canine scans of [Petitioner]'s pants and the currency found inside. The dog, according to his handler—Annapolis Police Officer Christopher Tucker— was trained to detect the scent of marijuana, heroin, cocaine, methamphetamine and related drug derivatives in "various quantities from residual to larger amounts." And the dog, according to Officer Tucker, had successfully identified drug-tainted currency on 40–50 prior occasions. In two separate scans, Aries "alerted" to [Petitioner]'s pants and the currency inside.

*Johnson v. State,* No. 2473, September Term, 2005, slip op. at 1–3, 176 Md.App. 758 (footnotes omitted). Although the State did not need the canine scan evidence to generate a jury question on the issue of whether Petitioner had been in possession of the drugs found in the bedroom, because Petitioner was not in actual possession of any drugs when he was finally taken into custody, the canine scan evidence was obviously of significant consequence to the issue of whether the State had satisfied its burden of persuasion.

The following transpired during a pretrial *in limine* hearing:

[DEFENSE COUNSEL]: ... The next [motion *in limine*] is that the State attorney, I believe, will be trying to

introduce evidence of the dog alert to my client's pants. I would argue that that would be misleading to the jury.

They would take more weight out of what that particular experience is about and that would unnecessarily lead them to a conclusion that there were actually drugs there when the dog's alert is really to an owner [odor]—it gives probable cause when you are trying to arrest somebody, but I don't believe that that should be coming in as substantive evidence against my client on these particular drug charges.

The Circuit Court denied the motion "at this moment," but agreed to "revisit" this issue during the trial.

The prosecutor's opening statement, which made no mention of the canine scan evidence, included the following comments:

Well, in this case the Defendant made a mistake. Basically, he was wanted by the police on the date in question.

\* \* \*

Well Officer Kintop . . . sees the Defendant and he almost gets him. And he is wanted at this point, but he gets away.

But that doesn't stop the police, they are still looking for this Defendant. And . . . the police find him.

And they go to the house where the Defendant is. The police surround the house and, low and behold, they see the Defendant's face pop up and look out the window. And they know who it is, so they know that it is him.

As the police are surrounding the house, something funny happened. They start hearing things moving around, the furniture. Remember, this is a bedroom that is like looking out over the street. And the police hear all this noise, so they know he is up to something.

\* \* \*

So the police surround him. They have a consent to search the place from the actual homeowner. He comes out and he surrenders himself. They take him into custody. And the police go up to that very room where he had just been spotted and, low and behold, there are drugs.

* * *

By the way, something else happened that was kind of significant. When the police come in, all the drugs are on this bed, basically, hastily dumped because the Defendant didn't have time to do a better job of hiding his stash.

But there is a cell phone on that bed. And when the police actually take this Defendant into custody he has got a cell phone clip on his belt, but no cell phone. The cell phone is one of the things that got dumped because that is probably where he is getting those calls in from people who want to buy drugs.

So the police—it is real simple, but they basically take the phone and you know what? It is a perfect match; it is a fit. And you will be able to see the cell phone. And you will be able to hear from the Detective who seized the clip and . . . will tell you that he matched the clip up.

The opening statement by Petitioner's trial counsel likewise made no mention of the canine scan evidence.

When the State called Officer Tucker to the stand, Petitioner's trial counsel requested a bench conference, and the Circuit Court granted that request. The following transpired at the bench:

[DEFENSE COUNSEL]: I just want to preserve this issue. I hear the Court's ruling and I just want to say that I object to anything that Officer Tucker has to say.

I think that his testimony will be irrelevant. And if it is deemed relevant, it will be confusing and misleading to the jury. He can testify about probable cause. If he is not able to say yes, the drug dog is, you know, like a chemical reaction test that gives us proof that it was drugs in his pants.

THE COURT: All right. I will take that under advisement. My ruling stands right now.

At this point, Petitioner's trial counsel requested a "continuing objection" to the canine scan evidence, and the Circuit Court granted that request. During Officer Tucker's direct

examination, he was asked a series of "qualifications" questions, most of which are included in § 4.1 (Predicate questions for direct examination of [the] canine handler) of a "guide" prepared by a staff attorney in the Drug Enforcement Administration's Office of Chief Counsel, and "designed to suggest ways the canine handler and prosecutor can strengthen the impact of canine alert 'testimony' in court." This guide includes the following recommendations:

### 4 Preparing The Canine Handler For Trial

The canine handler, having followed the proper procedures governing the use of the canine and having thoroughly documented the activities of the canine, must still be prepared to persuade a judge or jury that the canine is competent to detect the scent of drugs and that the handler is competent to interpret the canine's message. The government counsel, likewise, should be prepared to counter challenges to the canine's evidence, which often takes the form of evidence of currency contamination.

### 4.1 Predicate questions for direct examination of canine handler

The government attorney must be prepared to set out the qualifications of both the canine and the handler in a convincing manner at trial. The following is a sample of predicate questions which may assist the government attorney in doing this.

1. How long have you been employed in your present occupation and what is the nature of your duties and responsibilities?

2. What specialized training have you had in the handling of a drug canine? How long have you been paired with this canine?

3. What specialized training has the canine had in the detection of drugs? What was the canine required to do in order to successfully complete that training?

4. Has the canine been trained on controlled substances or "pseudo-substances"? Is it better to train a canine

on controlled substances? What do you use when training your canine?

■ Describe the process by which the canine is certified to detect drugs and you are certified to handle the canine.

■ How often are you each recertified and describe that process?

■ How many hours per week do you train your canine? Describe the training activities and explain the importance of these activities to the canine's performance. Do you document this training?

■ Have you ever discovered that your canine was alerting to a scent other than a drug scent, and, if so, what steps have you taken to correct that behavior? Have you documented these instances?

■ Has the canine ever alerted and a subsequent search failed to reveal either drugs or money? In those instances, has your follow-up discovered evidence to suggest that drugs were in fact present at one time in that area? Have you documented these instances?

■ What quantity of drugs has your dog been trained on and what quantity do you use when training your dog?

11. Have you ever tested your canine with currency drawn from a bank to determine if your canine is mistakenly alerting just to the scent of currency in general circulation? Have you documented those instances?

12. Some people believe that most of the currency in general circulation is contaminated with drug residue, and that therefore a canine will always alert to currency, even currency in a bank. Based upon your tests with currency drawn from banks, is that a legitimate belief?

13. When seized currency is to be tested by [the] canine, how is the testing area prepared and how is the curren-

cy handled to insure that the canine is not alerting to a scent other than the scent of drugs?

William E. Ringel, *Searches and Seizures, Arrests and Confessions,* app. 6, §§ 4 & 4.1 (West ed. Supp. 2008).

The following transpired during Officer Tucker's direct examination:

[THE PROSECUTOR:] And have you ever discovered that your canine was alerting to a scent other than a drug scent?

[OFFICER TUCKER:] No.

[THE PROSECUTOR:] And has the canine ever alerted [where] a subsequent search failed to reveal either drugs or money?

[OFFICER TUCKER:] Neither drugs or money. Is that what you said?

[THE PROSECUTOR:] Yes. Or either drugs or money?

[OFFICER TUCKER:] Yes, that has occurred.

[THE PROSECUTOR:] And in those instances[,] has your follow-up discovered evidence to suggest that drugs were in fact present at one time in that area?

[OFFICER TUCKER:] Yes, many times.

[THE PROSECUTOR:] And have you documented those instances?

[OFFICER TUCKER:] Yes, I have.

\* \* \*

[THE PROSECUTOR:] And how many times have you used your canine to examine currency?

[OFFICER TUCKER:] Approximately, I'd say 50–40, 50 times.

[THE PROSECUTOR:] And how many times that you know of has your dog alerted?

[OFFICER TUCKER:] In street patrol, those 40 to 50 times[,] they've actually all been positive alerts.

[THE PROSECUTOR:] And have you ever tested your canine with currency drawn from a bank to determine if

your canine is mistakenly alerting just to the scent of currency in general circulation?

[OFFICER TUCKER:] Yes, I have.

[THE PROSECUTOR:] And what [were] the results of that?

[OFFICER TUCKER:] It was a controlled—training situation. The dog did not alert to the—it was circulated currency drawn from a bank.

[THE PROSECUTOR:] And some people believe that most of the currency in general circulation is contaminated with drug residue and that therefore canine will always alert to currency, even currency in a bank. Based on your test of the currency drawn from a bank, was that a legitimate [belief]?

[DEFENSE COUNSEL:] Objection.

THE COURT: Overruled. You may answer.

[OFFICER TUCKER:] I don't believe so, no.

[THE PROSECUTOR:] And when seized currency is to be tested by the canine, how is the testing area prepared?

[OFFICER TUCKER:] Well, I always make sure that the [officer] is instructed to have the money packaged in a clean package, whether it's an envelope or bag.

I also make sure I always bring my canine into the area that's going to be used for the testing before the money is placed by that officer and allow them to search the area to insure that they don't give any positive alerts; that is, they aren't being contaminated by controlled substances at some other prior time or some other drugs there that could compromise the actual search of the currency that's going to be performed.

Officer Tucker then testified about the scans performed on Petitioner's clothing and on the cash seized from Petitioner's person. According to Officer Tucker, "the dog was alerting to the scent of controlled substances, which he is trained to detect[.]"

The prosecutor's closing argument included the following comments:

Finally, perhaps some of the best evidence is the dog. This is a good dog. The dog is named Aries. He and his handler have been through a ton of training. And I invite you to take a look at the exhibits that were entered. The certifications that he has been through.

Not only does he get these certifications, but he goes through them on a yearly basis. He keeps training with the dog. He goes to the classes. But importantly, every single day he is working with that dog. He lives with that dog. That dog is a very important part of his life.

He knows that dog well. They hang around at the station and make up drills for the dog sometimes just for fun. Sometimes they try to trick the dog. They give him a non-CDS item and they try to see if the dog will alert on it.

And what Officer Tucker said was really important. This is a good dog. This is a dog that doesn't make mistakes. He hasn't had to go through and try to retrain the dog except that when it takes out the wrong substance. It doesn't. When that dog smells what it believes to be CDS, it sits. It alerts is what we call it.

And in this case, they have the Defendant take off his pants. They clear the room. They have the dog search the room when there is nothing in it; no drugs, no items.

They bring the dog back out. They hide the pants. They hide the $845 that the Defendant had and guess what? The dog alerts. You can't fool the dog. The dog alerted to the Defendant's pants pocket.

So you will have that as evidence. The—was cut out; it was not the entire pair of pants. But the dog alerted because the drugs were in the Defendant's pants. They were on his person when the house got surrounded and the Defendant ha[d] to unload the drugs. You can't fool the dog.

During the closing argument for the defense, Petitioner's trial counsel emphasized the fact that no "fingerprint" evi-

dence or "DNA" evidence linked Petitioner to the drugs, suggested that the drugs belonged to the occupants of the house, and urged the jurors "to ask yourself if you had five to ten minutes do you leave the drugs out in the middle of the bedroom?" Petitioner's trial counsel did not, however, say anything about the canine scan evidence.

During the State's rebuttal argument, the prosecutor stated:

Number two, if Ms. Allen is the person whose drugs they were; whose phone was there, why is the dog picking out his pants out of the room? Why is the dog picking out the Defendant's money in this room?

As stated above, Petitioner was convicted of the burglary and controlled dangerous substances violations, those convictions were affirmed by the Court of Special Appeals, and this Court granted his petition for writ of certiorari.

### Discussion

#### I.

■ Petitioner's argument that the canine scan evidence should have been excluded under Md. Rules 5–401 and/or 5–403 is based upon the argument that the Circuit Court should have taken judicial notice of the "currency contamination theory." We are persuaded, however, that the Circuit Court did not err or abuse its discretion in overruling Petitioner's objection to Officer Tucker's testimony that "the dog was alerting to the scent of controlled substances[.]"

The currency contamination theory is based upon the assumption that a high percentage of United States currency bills in circulation contain trace amounts of cocaine and/or other drug residue. *See, e.g., Illinois v. Caballes,* 543 U.S. 405, 412, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (Souter, J., dissenting) (noting "the pervasive contamination of currency by cocaine"); *Bennis v. Michigan,* 516 U.S. 442, 460 n. 1, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) (Stevens, J., dissenting) (noting that "[i]t has been estimated that nearly every United States bill in circulation—some $230 billion worth—carries trace amounts of cocaine"); *Muhammed v. Drug Enforcement*

*Agency,* 92 F.3d 648, 653 (8th Cir.1996) ("[I]t is well established that an extremely high percentage of all cash in circulation in America today is contaminated with drug residue."); *United States v. Saccoccia,* 58 F.3d 754, 777 (1st Cir.1995) (recognizing the "widespread contamination of currency").

Although not yet "as numerous as the sands of the sea," cases discussing the currency contamination theory often cannot be reconciled.[2] Because Petitioner did not present any expert testimony in support of his argument that canine scan evidence is "misleading," the case at bar does not present admissibility issues involving such testimony.[3] Petitioner requests that, pursuant to Md. Rule 5–201(b), this Court "judicially notice" that currency contamination is so widespread as to require the exclusion of the canine scan evidence in the case at bar.

Maryland Rule 5–201(b), which is identical to Rule 201(b) of the Federal Rules of Evidence, requires that a judicially noted fact be "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy

---

**2.** Over fifty years ago, Dean McCormick declared that cases dealing with the admissibility of "other crimes evidence" are "as numerous as the sands of the sea." McCormick, *Evidence,* 307 n. 2 (1954). Judge Weinstein's Evidence treatise includes the comment that "the question of when evidence of a particular criminal act may be admitted is so perplexing that the cases sometimes seem as numerous 'as the sands of the sea' and often cannot be reconciled." 2 Jack B. Weinstein et al., *Weinstein's Evidence,* § 404[08], at 404–40 (1978).

**3.** In *Saccoccia, supra,* the jury heard from two experts called by the defendant who criticized the tests performed by the drug-sniffing dog, and opined that a canine alert to currency does not support the conclusion that the currency was derived from narcotics trafficking. In *United States v. $141,770. 00 in U.S. Currency,* 157 F.3d 600 (8th Cir.1998), while applying the *Daubert [v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] test to determine whether the District Court had erroneously granted the government's motion to exclude expert testimony that would discredit the significance of a dog's alert to seized currency, the United States Court of Appeals for the Eighth Circuit affirmed the District Court's findings that the proffered testimony was both unreliable and irrelevant. 157 F.3d at 604–06.

cannot reasonably be questioned." Of the cases that have addressed the question of whether the trial court should take judicial notice of the fact that *most* currency in circulation contains detectable traces of controlled dangerous substances, we are persuaded that the better reasoned cases are the ones holding that such a fact should not be judicially noticed.

Cases holding that the result of a properly conducted canine scan test does have *some* probative value include *United States v. Carr*, 25 F.3d 1194 (3d Cir.1994), *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 459–60 (7th Cir.2005), *United States v. Jaimes*, 297 F.Supp.2d 1254, 1255–56 (D.Haw.2003), and *Evans v. City of Aberdeen*, 926 So.2d 181, 185 (Miss.2006). In *Carr*, while rejecting a request to take judicial notice that nearly all currency contains detectable traces of illegal narcotics, the United States Court of Appeals for the Third Circuit stated:

> Both Carr and Cardona argue that any evidence concerning positive drug-sniff identifications by the trained canines should not be considered probative of guilt, given that studies have shown that between seventy and ninety-seven percent of all cash in circulation in the United States is tainted with a sufficient quantity of cocaine to alert a trained dog. *See United States v. Fifty-three Thousand Eighty-two Dollars ($53,082) in United States Currency*, 985 F.2d 245, 250–51 n. 5 (6th Cir.1993) (dicta questioning the evidentiary value of a trained dog's alert to currency); *United States v. Six Hundred Thirty-nine Thousand Five Hundred and Fifty-eight Dollars ($639,558) in United States Currency*, 955 F.2d 712, 714 n. 2 (D.C.Cir.1992) (dicta discussing studies). Citing only to these two cases as authority, they argue that the alerts mean nothing. At oral argument Carr requested that this court take judicial notice of the fact that a large percentage of dollar bills in circulation is tainted with illegal narcotics, without directing the court to any particular study.

Under Federal Rule of Evidence 201(f), judicial notice of an adjudicative fact may be taken by an appellate court.

However, the "fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned." Fed. R.Ev. 201(b). We decline to take judicial notice in this instance because we do not believe that such a fact is either commonly known or readily determinable through unquestionably reliable sources.

\* \* \*

Because we decline the defendants' invitation to take judicial notice of the fact that nearly all currency contains detectable traces of illegal narcotics, we consider the dog alert evidence as only another piece of evidence tending to show that Carr and Cardona knew that the money involved in the conspiracy was derived from illegal drug trafficking. We note that the cases relied on by Carr and Cardona for authority, that courts of appeals increasingly are calling dog alert evidence into doubt, discuss this proposition only in dicta because in both cases the courts independently upheld a trial court's grant of a motion to suppress the cash as evidence. *United States v. $53,082*, 985 F.2d [245] at 250 [(6th Cir.1993)]; *United States v. $639,558*, 955 F.2d [712] at 714 [(D.C.Cir.1992)]. Furthermore, this court has recognized that a district court has discretion to admit a trained dog's alert to currency as evidence of guilt. *See United States v. Headley*, 923 F.2d 1079, 1082 n. 1 (3d Cir.1991). On this record, we cannot say that the district court abused its discretion in admitting the dog sniff evidence.

*Id.* at 1203 n. 3.

In *Saccoccia, supra*, while affirming racketeering and related convictions, and rejecting the argument that the appellant was unfairly prejudiced by the testimony of a canine unit officer whose drug sniffing dog alerted to the presence of drugs on cash that the appellant had deposited into a bank, the United States Court of Appeals for the First Circuit stated:

Even though widespread contamination of currency plainly lessens the impact of dog sniff evidence, a trained dog's alert still retains some probative value. Ordinary experience suggests that currency used to purchase narcotics is more likely than other currency to have come into contact with drugs.

*Saccoccia,* 58 F.3d at 777. We agree with this analysis, and therefore hold that—at this point in time—it cannot be judicially noticed that currency contamination is so widespread as to require the exclusion of canine scan evidence.[4]

## II.

■■■■ We are persuaded that the issue presented in Petitioner's third question was preserved for appellate review. The record shows that, subsequent to the denial of Petitioner's *in limine* motion to exclude the "dog alert" evidence, (1) Petitioner's trial counsel requested a "continuing objection" to the line of questions pertaining to the "alert," and (2) the Circuit Court granted that request. Under Md. Rule 4–323(b), however, a "continuing objection is effective only as to questions clearly within its scope." A line of questions that introduce and purportedly discredit the currency contamination theory is not "clearly within [the] scope" of the continuing objection granted by the Circuit Court.

The record also shows that Petitioner's trial counsel interposed a timely *general* objection to Officer Tucker's opinion. Under Md. Rule 4–323(a), the Circuit Court could have directed that Petitioner's trial counsel state the grounds for the objection. The Circuit Court, however, overruled the objection without directing that the grounds for the objection be

---

4. The case at bar does not present the question of what may be argued about currency contamination in an effort to lessen the impact of canine scan evidence. It is well settled that, during closing argument, "[j]urors may be reminded of what everyone else knows, and they may act upon and take notice of those facts which are of such general notoriety as to be matters of common knowledge." *Wilhelm v. State,* 272 Md. 404, 439, 326 A.2d 707, 728–29 (1974). The issue of whether and/or the extent to which a judicially noted fact would support a jury argument should be decided at an *in limine* hearing.

stated. In *DeLeon v. State,* 407 Md. 16, 962 A.2d 383 (2008), this Court reaffirmed the well settled principle that "a party basing an appeal on a 'general' objection to admission of certain evidence, may argue *any* ground against its inadmissibility. *Boyd v. State,* 399 Md. 457, 475–76, 924 A.2d 1112, 1122–23 (2007)." *Id.* at 24–25, 962 A.2d at 387 (emphasis in original). Under these circumstances, Petitioner's present argument was not waived.

## III.

■■ Although the parties have argued that the determination of whether the State was entitled to ask the "legitimate belief" question during Officer Tucker's direct examination presents "scientific evidence" and "expert testimony" issues, the case at bar actually presents an "order of proof" issue. For the reasons that follow, we hold that Petitioner was unfairly prejudiced during the State's case-in-chief when the prosecutor raised the currency contamination theory and then presented expert testimony refuting that theory.

The State was certainly entitled to establish the qualifications of both Officer Tucker and Aries,[5] and to ask questions about techniques employed to make sure that the dog would not alert to "uncontaminated" currency. The Circuit Court, however, should have sustained Petitioner's objection to the "currency contamination" question:

---

5. As to qualifications, Officer Tucker testified that he and his drug-sniffing dog, Aries, "are trained in the detection of narcotics," and have been assigned to the canine unit of the Annapolis City Police Department since March of 2003. Aries is "trained to detect the scents of marijuana, heroin, cocaine, methamphetamine and derivatives of each[, and] various quantities from residual to larger amounts." To become certified, Aries was trained to give certain "alerts," as well as to recognize the difference between a controlled dangerous substance and a pseudo or fake substance. The State offered into evidence three exhibits certifying that Officer Tucker and Aries were "certified in street patrol and narcotics detection," and moved to have Officer Tucker qualified "as an expert in the canine [scans] to identify and locate controlled dangerous substances." The Circuit Court granted that motion, recognizing "Officer Tucker as an expert in the area of canine police work. And particularly with regard to scans for CDS."

And some people believe that most of the currency in general circulation is contaminated with drug residue and that therefore canine will always alert to currency, even currency in a bank. Based on your test of currency drawn from a bank, was that a legitimate [belief]?

 This question was objectionable for six reasons. First, it assumed a fact not in evidence. "An argumentative question is one which incorporates by assumption a fact otherwise not in evidence." *Clermont v. State*, 348 Md. 419, 431, 704 A.2d 880, 886 (1998). "Questions that assume facts not in evidence are an objectionable subcategory of leading questions[.]" McLain, *Maryland Evidence* § 611.5 (2001). "When a question asserts facts that have not been established at trial, the question is objectionable because it brings to the attention of the jury facts that are not in evidence." Dennis D. Prater et. al., *Evidence: The Objection Method* 7 (2d ed. 2002). *See also* Ashley S. Lipson, *Is it Admissible?* §§ 4.100– 4.600 (Ben Ritter ed., James Publishing, Inc., rev. 10th ed. Supp. 2008).

Moreover, even if the "assumes a fact not in evidence" objection would be inapplicable to a question which assumes a judicially noticed fact that is not subject to reasonable dispute, the question at issue is not such a question. While it may well be a fact that there are "some people" who believe that a "canine will always alert to ... [newly printed] currency in a bank," for the reasons stated in part I. of this opinion, such a fact could not be "judicially noticed" under Md. Rule 5–201(b).

Second, both the question and the answer were unclear and therefore "likely to confuse and mislead the jury by asking of the witness his opinion upon facts ... not completely stated[.]" *Donnelly v. Donnelly*, 156 Md. 81, 86, 143 A. 648, 651 (1928). How many people are "some" people? How much currency is "most" currency? Does "currency in a bank" include newly printed currency? Was the "test of currency drawn from a bank" performed on randomly selected currency or. newly printed currency? Was the answer suggesting that only a small percentage of currency is actually contaminated, or that

it would be unreasonable to believe that a large percentage of currency is contaminated?

Third, the question called for an opinion that had not been the subject of discovery. In *Ragland v. State,* 385 Md. 706, 870 A.2d 609 (2005), this Court held that opinions based on a witness's "training and experience ... should only [be] admitted as expert testimony, subject to the accompanying qualification and discovery procedures." *Id.* at 709, 870 A.2d at 611. In the case at bar, Petitioner's trial counsel requested discovery of all tests, experiments and conclusions that the State intended to present at trial. Although the State obviously complied with its duty to put the defense on notice that it would be presenting the "drug dog alert" evidence, Md. Rule 4–263(b)(4)[6] also required that the State put the defense on notice of its intention to present expert testimony debunking the currency contamination theory.

Fourth, although the State established that Officer Tucker is "an expert in the area of canine police work," the State did not establish that he is qualified to express an opinion about the percentage of cash that is contaminated with drug residue. *In re Yve S.,* 373 Md. 551, 819 A.2d 1030 (2003), this Court stated:

> [T]he mere fact that a witness has been accepted to testify as an expert in a given field is not a license to testify at will. Such a witness only will be allowed to testify as an expert in areas where he or she has been qualified and accepted. Where a witness who is qualified as an expert in one area strays beyond the bounds of those qualifications into areas reserved for other types of expertise, issues may arise as to the proper admissibility of that testimony.

373 Md. at 613, 819 A.2d at 1066.

Fifth, the question called for an answer based upon a single test, and was not preceded by a foundational showing that the

---

**6.** In *Hutchinson v. State,* 406 Md. 219, 958 A.2d 284 (2008), this Court noted that, "[e]ffective July 1, 2008, the Maryland rules governing criminal discovery were significantly amended." *Id.* at 227 n. 1, 958 A.2d at 288 n. 1. The State's "expert witness" discovery obligations are now set forth in Md. Rule 4–263(d)(8). *Id.*

test was conducted "under similar conditions and like circumstances to those existing in the case at issue." *Smith v. State Rds. Comm'n,* 240 Md. 525, 537, 214 A.2d 792, 798 (1965).

Sixth, the question was unfairly prejudicial because it violated the rule against the introduction of "anticipatory rehabilitation" and/or "strawman rebuttal" evidence. Under this rule, unless the defendant's opening statement and/or *cross-examination* of a State's witness has "opened the door" to evidence that is relevant (and *now* admissible) for the purpose of either rehabilitation or rebuttal, the State is prohibited from introducing during its case-in-chief—and thereafter rebutting—such evidence in order to "bolster" that witness's testimony.[7] Because this rule applies to expert testimony as well as to non-expert testimony, the Circuit Court should have prohibited the State from bolstering Officer Tucker's testimony about the significance of the canine scan.

It is well settled that "[a]ny competent evidence which explains, or is a direct reply to, or a contradiction of, material evidence *introduced by the accused* may be produced by the prosecution in rebuttal." *Lane v. State,* 226 Md. 81, 90, 172 A.2d 400, 404 (1961) (emphasis added). It is equally well settled that the State's case-in-chief may include "rebuttal" evidence to which the defense has "opened the door," either during opening statement, or through cross-examination of a State's witness. As to opening statements, in *Martin v. State,* 364 Md. 692, 775 A.2d 385 (2001), this Court agreed with the trial court's conclusion that defense counsel's opening statement had "opened the door" to "rebuttal evidence" that the State was then entitled to present during its case-in-chief. *Id.* at 707–08, 775 A.2d at 394. In the case at bar, however, the opening statement of Petitioner's trial counsel did not "open the door" to the opinion at issue, which was mentioned for the first time during Officer Tucker's *direct* examination.

---

7. A similar rule prohibits the State from introducing during its case-in-rebuttal "evidence to impeach an issue which it first solicited on [the] cross-examination [of the defendant or a defense witness]." *State v. Kidd,* 281 Md. 32, 47, 375 A.2d 1105, 1116 (1977).

The prohibition against "anticipatory rehabilitation" and/or "strawman rebuttal" evidence is well established. In *Weiner [a/k/a Werner] v. State*, 55 Md.App. 548, 464 A.2d 1096 (1983), a defendant who had been convicted of carnal knowledge and statutory rape of his stepdaughter was granted a new trial on the ground that, during the stepdaughter's direct examination, she testified that she decided to report her stepfather to the police only after she was told that he had subsequently molested her younger sister. Rejecting the argument that the State was entitled to present this "anticipatory rehabilitation" evidence, the Court of Special Appeals stated:

> [W]e point out that the disputed testimony was initially introduced by the State, apparently in anticipation of the defense seizing upon any unexplained delay as an attack upon the credibility of the prosecuting witness, Amy. Had the State remained silent regarding the lapse of time from the last act of intercourse until Amy's complaint, Appellant's dilemma would have been whether to avoid the issue and lose the advantage of bringing the delay to the attention of the jury, or to cross-examine Amy concerning her five year silence, with the attendant risk that her answers would reveal the very evidence the Appellant sought to suppress.
>
> If the testimony of other crimes came about through cross-examination by counsel for Appellant, or from other defense testimony, we perceive no reason why it should not have been admitted. The State's initial presentation of the evidence in anticipation of a defense tactic that may well have never taken place, however, is another matter. We conclude that the introduction of this testimony by the State in its case in chief was prejudicial error.

*Id.* at 558, 464 A.2d at 1102–03.

While affirming the decision of the Court of Special Appeals, *State v. Werner*, 302 Md. 550, 489 A.2d 1119 (1985), this Court stated:

> [T]he failure of a sex offense victim to complain at the time of the crime or shortly thereafter is ... an impeaching

circumstance which, if elicited by the defense, can then be explained by the State.

In the instant case, however, the State impeached its own witness by bringing out on direct examination the fact that she waited five years to complain. This was, it would seem, inadmissible evidence as part of the State's case in chief. But, whether or not inadmissible, it was not necessary. The State itself, by this "bootstrap" operation, created the alleged need for presenting evidence of other crimes by the defendant. The Court of Special Appeals correctly held that, under these circumstances, the evidence of other offenses was inadmissible.

*Id.* at 565, 489 A.2d at 1126–27 (footnote omitted).

In *Wynn v. State,* 351 Md. 307, 718 A.2d 588 (1998), while reversing housebreaking and theft convictions on the ground that the petitioner was unfairly prejudiced by evidence that he had committed other housebreakings, this Court made it clear that the State could not assert the "mistake" defense in order to introduce "absence of mistake" evidence during its case-in-chief:

Under the circumstances of the case at hand, the absence of mistake exception is not applicable for two reasons. First, petitioner never asserted that he entered the house mistakenly or that the housebreaking was a mistake.

\* \* \*

In order to admit the other crimes evidence the State may have been creating a straw person by inferring that petitioner claimed he purchased the property at a flea market and that claim was a "mistake." The jury had to determine whether petitioner stole the property or purchased the property not whether, if he purchased the property, he was mistaken in doing so in that it was stolen property. . . . Under these circumstances, where there is no defense of mistake in reference to the housebreaking and no suggestion that the property might have been mistakenly stolen, believing he had a right to take it, absence of mistake is irrelevant. It is clear that the only possible inference the

jury could have drawn from the other crimes evidence was that if petitioner had property from separate housebreakings, he must have been the housebreaker.

*Id.* at 331–32, 718 A.2d at 600.

Having concluded that the Circuit Court should have sustained Petitioner's objection to the question asserting that "some people believe that most currency in general circulation is contaminated with drug residue … even currency in a bank," thereby excluding the canine officer's opinion that such a belief is not a "legitimate" one, we are required to order a new trial unless we are "persuaded beyond a reasonable doubt that [the inadmissible evidence admitted over Petitioner's objection] did not contribute to the guilty verdict[s] returned against [him]." *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). As stated above, because Petitioner was not in actual possession of any drugs when he was finally taken into custody, the canine scan evidence was obviously of significant consequence to the issue of whether the State had satisfied its burden of persuasion. In light of the importance that the State attached to the canine scan evidence, we are not persuaded beyond a reasonable doubt that the introduction of the inadmissible evidence constituted harmless error.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE ITS JUDGMENT AND REMAND TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY ANNE ARUNDEL COUNTY.**

BELL, C.J., joins in judgment only.