REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2718

September Term, 2011

---

BRITTANY NORWOOD

v.

STATE OF MARYLAND

---

Berger,
Nazarian,
Leahy,

JJ.

---

Opinion by Berger, J.

---

Filed: April 29, 2015

On the morning of March 12, 2011, Brittany Norwood ("Norwood"), appellant, and her co-worker, Jayna Murray ("Murray"), were discovered in the Lululemon Athletica retail store in Bethesda, Maryland, the apparent victims of a violent attack. Murray was found deceased, having suffered approximately 331 individual injuries. Norwood was found bound with zip-ties, with a laceration on her forehead and scratches on her abdomen. Norwood's pants were torn at the crotch. A check of Norwood's neck, back, and extremities revealed no injuries. Norwood was placed on a stretcher and transported to a hospital for medical treatment.

Over the course of the next several days, authorities investigated the incident and subsequently came to view Norwood as a suspect rather than a victim. Norwood was ultimately arrested on March 18, 2011 and was subsequently charged with murder. Following an eight-day trial in the Circuit Court for Montgomery County, the sole charges submitted to the jury were first-degree premeditated murder and second-degree specific intent to kill murder. On November 2, 2011, the jury found Norwood guilty of first-degree murder. On January 27, 2012, the court sentenced Norwood to life imprisonment without the possibility of parole.

Norwood presents two issues for our review on appeal, which we have rephrased and reordered as follows:

> 1. Whether the trial court erred by denying Norwood's motion to suppress statements she made to the police on March 16 and 18, 2011.

2. Whether the trial court abused its discretion by permitting a witness to testify about a laceration he saw on Norwood's hand and about knife wounds he had seen in the past.

For the reasons stated herein, we shall affirm the judgment of the Circuit Court for Montgomery County.

## FACTS AND PROCEEDINGS

Many of the underlying facts of this case are not relevant to the rather limited issues raised on appeal. We set forth the facts significant to the issues presented and further facts that are relevant to the overall context in the light most favorable to the prevailing party.

Norwood and Murray were co-workers at the Bethesda Lululemon Athletica retail store. They had worked together at the store on the night of March 11, 2011. After closing the store, both Norwood and Murray left the building. At 9:51 p.m., Norwood telephoned Eila Rab, another sales associate at Lululemon, and told her that she had left her wallet at the store. Norwood asked Ms. Rab for Murray's telephone number so that she could call Murray and ask her to meet her at the store to let her in. Ms. Rab sent Murray's phone number to Norwood via a text message.

Norwood telephoned Murray, and Murray agreed to meet Norwood at the store. Once Norwood and Murray met at the Lululemon store, a violent encounter occurred which resulted in Murray's death. Employees at the Bethesda Apple Store, which adjoined the Lululemon store, heard noises coming from the Lululemon store shortly after 10:00 p.m., including sounds of dragging, grunting, thudding, and high-pitched squealing. One Apple

Store employee asked a security guard to check the nature of the disturbance and spoke to another manager about the noises. The employee continued to hear noises, including screaming and yelling. The employee heard one female voice which sounded hysterical and another female voice saying, "Talk to me. Don't do this. Talk to me. What's going on?" The employee heard additional screaming, yelps, and yells, and heard a voice say, "God help me. Please help me." She did not believe the voice pleading to God was the same voice that had said, "Talk to me. Don't do this." The employee left the Apple Store shortly after 11:00 p.m.

Norwood attacked Murray with multiple weapons, causing approximately 331 individual injuries and ultimately Murray's death. Murray had injuries to her head, face, neck, back, and extremities. According to the medical examiner, Murray was alive when she incurred the majority of her injuries. A stab wound to the back of Murray's head hastened her death.

Norwood doctored the scene in order to make it appear that a robbery had occurred and that both Murray and Norwood had been victims of an attack. Norwood used a pair of men's size fourteen Reebok tennis shoes to create bloody footprints at the crime scene.[1] Norwood moved Murray's car to a parking lot further from the Lululemon store and moved various items in the Lululemon store in an attempt to make it appear that a robbery had

---

[1] The shoes were kept in the Lululemon store for customers to use when trying on Lululemon clothing.

3

occurred.  Norwood opened the safe in the store and removed three bags of money from it. Norwood inflicted various superficial injuries upon herself, cut a slit in the crotch of her pants, bound her hands and feet with zip ties, and laid on the floor.  Norwood then waited to be discovered the following morning.

On the morning of March 12, 2011, manager Rachel Oertli arrived at the Lululemon store shortly before 8:00 a.m.  She noticed that the door was unlocked and initially believed that someone had arrived just before her and had forgotten to lock the door.  When she entered the store, the lights were on and things were out of place, leading her to believe an altercation had occurred.  Ms. Oertli called out and heard someone moaning.  She left the store and immediately called 911.  Ms. Oertli saw a man, Ryan Haugh, waiting outside the Apple Store[2]  and asked him if he would accompany her into the Lululemon store.  Although he did not know Ms. Oertli, Mr. Haugh agreed to enter Lululemon with her.  After they entered, Mr. Haugh went toward the back of the store by himself at Ms. Oertli's request.  Mr. Haugh saw a body lying face down and called out to Ms. Oertli to call the police because it appeared as if someone was dead.  As Mr. Haugh walked back toward Ms. Oertli, he saw a second person who was tied up but breathing.  Mr. Haugh told Ms. Oertli that there was one person who was dead and another person who was alive and appeared to have been sexually assaulted.  Ms. Oertli called police for a second time.

---

[2] The Apple Store did not open until 10:00 a.m.  Nevertheless, Mr. Haugh had arrived early because he was waiting to purchase a second-generation iPad that had been released the previous day.

4

Several officers arrived shortly thereafter. When the police approached Norwood, she appeared to be unresponsive. The police found Murray face down in a pool of blood with no pulse. An ambulance arrived at approximately 8:00 a.m. Norwood was placed on a stretcher and transported to Suburban Hospital. Officer Colin O'Brien was working part-time for Suburban Hospital performing security work as a uniformed police officer on March 12. He met the ambulance carrying Norwood when it arrived and followed her stretcher into the trauma bay. Officer O'Brien observed a number of cuts on Norwood's chest, legs, arms, and forehead. In particular, Officer O'Brien noticed a one to two-inch laceration on Norwood's right hand that ran parallel to Norwood's thumb. While at the hospital, Norwood was examined by a sexual assault nurse examiner. The examination revealed no evidence of sexual assault.

Over the next several days, multiple police officers engaged in various conversations with Norwood. Norwood's statements to police officers during conversations were later the subject of a motion to suppress. Specifically, Norwood sought to suppress statements made on March 12, 14, 16, and 18.[3]

### *The March 12 Interview*

Detective Deana Mackie of the Montgomery County Police Department met with Norwood at Suburban Hospital at 10:25 a.m. on March 12, 2011 for approximately forty-five

---

[3] On appeal, Norwood challenges the trial court's ruling with respect to the interviews that occurred on March 16 and 18.

to fifty minutes. After her conversation with Norwood, Detective Mackie went to the Lululemon store before returning to Suburban Hospital at approximately 2:35 p.m. to speak with Norwood further. Detective Mackie viewed Norwood as a victim and spoke with her to obtain information in order to develop a suspect. Norwood spoke freely and responded appropriately to Detective Mackie's questions during both sessions. Norwood told Detective Mackie that she and Murray had been attacked by two men wearing masks. She described an attack by two men in significant detail. Norwood told Detective Mackie that she had been raped and sexually assaulted with a clothing hanger. In addition to speaking with Norwood, while at Suburban Hospital, Detective Mackie spoke with various medical professionals.

### *The March 14 Interview*

On March 14, 2011, at approximately 8:00 p.m., Detective Dimitry Ruvin and Detective James Drewry met with Norwood at her residence. The detectives were wearing plainclothes attire. The meeting had been arranged through telephone conversations with Norwood's family members. The detectives' purpose in visiting Norwood was to introduce themselves and inquire as to whether Norwood remembered any additional details of the incident. Detective Ruvin testified that he still considered Norwood a victim during the March 14 interview.

When the detectives arrived, they met several of Norwood's family members. Norwood emerged and the detectives introduced themselves and told her that they wanted to see if she had remembered anything else. At Norwood's suggestion, the detectives and

6

Norwood went downstairs to her living area and sat around a table in the living room area. Norwood recounted her story regarding the events of March 11-12, 2011 while the detectives took notes and recorded a portion of the interview.[4] The atmosphere of the conversation was very casual, and Norwood was coherent and cooperative. Norwood told the detectives that she was sexually assaulted. Norwood explained that the attacker told her that the only reason she was not killed was because she was "fun to fuck." Norwood said that one attacker pushed her onto Murray's body. Norwood told detectives that the attackers knew her name and address, which she presumed the attackers found on Comcast and Washington Gas bills which had been in her purse. Norwood told detectives that the attacker swore at her and called her a "dirty slut" and a racial epithet while sexually assaulting her.

Detective Ruvin testified that Norwood became emotional during the conversation about the sexual assault. She had tears in her eyes and looked down a lot, but continued to talk to the detectives. At the end of the interview, Norwood spoke with the detectives about

---

[4] An approximately 4-minute segment of the interview was recorded. The recorded portion included an explanation of when the two men entered the Lululemon store and what occurred thereafter. Norwood explained how Murray was struck by one man and she was attacked by another man. Norwood told the detectives that the man who attacked her was wearing black clothing, a ski-type mask and gloves, and that, based upon his voice, Norwood thought the attacker was in his mid-twenties and Caucasian. She told the detectives that he was approximately five feet five inches tall with a medium build. Norwood told detectives that she heard her attacker unzip his pants.

Norwood described Murray's attacker as approximately six feet tall with an average build. According to Norwood he was also wearing black clothing, a ski-type mask, and, based upon his voice, Norwood thought he was Caucasian.

7

what she was going to do in the future. Norwood told the detectives that her family wanted her to move back to Seattle, but that she had been recently offered a new job in Bethesda, which she planned to begin after she recovered.

The detectives recommended that Norwood inform her family members that the attackers knew her address. She told her family members in front of the detectives. Detective Ruvin testified that Norwood's family members were "very, very concerned." The detectives advised Norwood's family members to contact the police if they saw anything suspicious. Detective Ruvin testified that at the end of the March 14 interview, he still viewed Norwood as a victim.

### *The March 16 Interview*

The detectives met with Norwood a third time on March 16, 2011. Norwood came to the police headquarters at the request of Detective Drewry. By this time, Detective Drewry had begun to view Norwood as a suspect. Detective Drewry asked Norwood to come to headquarters in order to provide elimination fingerprints and hair samples. Detective Drewry testified at the hearing on the motion to suppress that Norwood was asked to come in both to provide elimination prints and because "it was also a ruse to get her to come in" to talk to the detectives. Norwood arrived at approximately 5:00 p.m. with two of her siblings. Norwood's siblings left to get something to eat and Norwood was asked to sit in an interview room.

8

The interview, which was video recorded, took place in an interview room at police headquarters.[5] The interview room had two doors, one of which was often left open and the other of which was occasionally open. During the first approximately one hour of the interview, Norwood spoke informally with Detective Drewry while waiting for evidence technicians to take hair samples, photographs, and fingerprints. Norwood again described being attacked by two assailants. When asked whether she knew the type of car Murray drove, Norwood replied that she did not know. At the end of the interview, Norwood left the station with her family.

The following day, Norwood's brother, Chris Norwood, and sister, Marissa Norwood, contacted the detectives via telephone. Norwood's siblings explained that Norwood had been withholding information from the detectives because she was afraid that the suspects would harm her. Specifically, one of Norwood's siblings told Detective Drewry that the attackers had forced her to move Murray's car. An additional interview was scheduled, at Marissa Norwood's request, for March 18, 2011 at 10:00 a.m.[6]

### *The March 18 Interview*

On March 18, Norwood arrived at police headquarters accompanied by her siblings, Marissa and Chris Norwood. Norwood went into an interview room with Detectives Drewry and Ruvin. At the beginning of the interview, Norwood discussed her plans for the future,

[5] The video recording is two hours and fifty-five minutes.

[6] The Norwoods said that it would be inconvenient to meet on March 17 but agreed to meet on March 18, at 10:00 a.m. at police headquarters.

9

including the possibility of moving back to her hometown of Seattle to move in with her brother, Chris. Norwood told Detective Drewry that her "only concern" with respect to moving to Seattle was that she wanted to be reachable by police during the investigation.

Unprompted, Norwood initiated a conversation regarding Murray's car, saying, "All right, I'm here because . . . ." Norwood told detectives that prior to the sexual assault, the attackers made her move Murray's car to a different parking lot. According to Norwood, the attackers told her they would be watching her the entire time and threatened to kill her if she talked to anyone. She explained that she went, alone, to move Murray's car. While moving Murray's car, Norwood saw a police officer in a patrol vehicle but did not flag down the officer or attempt to contact him because she was too afraid. When asked why she returned to the Lululemon store after moving Murray's car instead of driving away and attempting to contact police, Norwood explained that she was "afraid for [her] life" and that the attackers knew where she lived.

At one point during the interview, Norwood expressed, "we've been over this." Detective Drewry responded, "Yeah, but every time we go over it something else comes out or changes a little so I'm just trying to get it as straight as possible."[7] The trial court suppressed the statements made after this exchange.

_____

[7] On the DVD reviewed by this Court, this exchange occurred at 44:55, according to the counter on the Court's computer. The trial court stated that according to its counter, this exchange occurred at 44:29. Regardless, the court discussed what was being said by the parties at the point at which it found *Miranda* warnings were required, and the trial transcript reproduces the part of the recording which was played at trial.

Eventually, Detective Drewry told Norwood that he did not believe her story and explained to her why the evidence demonstrated that her story was a lie.[8] Norwood's siblings were brought into the interview room, and Detective Drewry explained to them why he believed Norwood had murdered Murray. Ultimately, Norwood was placed under arrest later that day.

Following an eight-day trial in late October and early November of 2011, the charges submitted to the jury were first-degree premeditated murder and second-degree specific intent to kill murder. The jury found Norwood guilty of first-degree murder. On January 27, 2012, the court sentenced Norwood to life imprisonment without the possibility of parole. This timely appeal followed.

Additional facts shall be included as necessitated by our discussion of the issues.

## DISCUSSION

### I.

Norwood maintains that the trial court erred by denying her motion to suppress statements made during the March 16, 2011 interview and during a portion of the March 18, 2011 interview. Norwood asserts that the circumstances of the March 16 and March 18 interviews would have led a reasonable person to believe that he or she was in custody, and therefore, *Miranda* warnings were required. Having reviewed the video recordings of each interview and the transcript of the motion to suppress, we are persuaded that the trial court

---

[8] This portion of the interview was suppressed by the trial court.

correctly determined that Norwood was not in custody and, therefore, Norwood was not entitled to *Miranda* warnings during the relevant time periods.

When reviewing the denial of a motion to suppress evidence "we confine ourselves to what occurred at the suppression hearing." *Gonzalez v. State*, 429 Md. 632, 647 (2012) (quoting *Lee v. State*, 418 Md. 136, 148 (2011)). Moreover, "[w]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State." *Id.* "The credibility of the witnesses, the weight to be given to the evidence, and the reasonable inferences that may be drawn from the evidence come within the province of the suppression court." *Id.* at 647-48 (citing *Longshore v. State*, 399 Md. 486, 499 (2007)); *see also Wilkes v. State*, 364 Md. 554, 569 (2001) ("We extend great deference to the fact finding of the suppression court and accept the facts as found by that court unless clearly erroneous."). We review *de novo* the question of whether, based on the facts presented, a constitutional right has been violated. *Williams v. State*, 372 Md. 386, 401 (2002) (citing *Wilkes v. State*, 364 Md. 554, 569 (2001)). *See also Upshur v. State*, 208 Md. App. 383, 392 (2012), *cert. denied*, 430 Md. 646 (2013).

The Fifth Amendment to the United States Constitution protects individuals from being compelled to make self-incriminating statements.[9]  U.S. Const. Amend. V.  In *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the United States Supreme Court recognized that a "police-dominated atmosphere" can be coercive and potentially "undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely."  The *Miranda* Court held that, "[i]n order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id*. at 467. The Court of Appeals described the warnings required by *Miranda* as follows:

> The prophylactic measures developed in *Miranda* are the now-familiar warnings that law enforcement personnel are required to convey to a suspect before embarking on any custodial interrogation:
>
> > [A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

---

[9] The Fifth Amendment to the United States Constitution provides:

> No person shall . . . be compelled in any criminal case to be a witness against himself.

U.S. Const., Amend. V.

13

*Gonzalez v. State*, 429 Md. 632, 650 (2012) (alteration in original) (quoting *Miranda*, *supra*, 384 U.S. at 479).

The requirements of *Miranda* only apply when a defendant is both (1) in custody; and (2) subject to interrogation. We have explained:

> The Supreme Court has recognized, however, that, although "[a]ny police interview of an individual suspected of a crime has 'coercive aspects to it,'" the *Miranda* requirements apply only to custodial interrogation. *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S.Ct. 2394, 2401-02, 180 L.Ed.2d 310 (2011). Thus, before a defendant can claim the benefit of *Miranda* warnings, the defendant must establish two things: (1) custody; and (2) interrogation. *Smith v. State*, 186 Md. App. 498, 518, 974 A.2d 991 (2009), *aff'd*, 414 Md. 357, 995 A.2d 685 (2010). The burden of "showing the applicability of the *Miranda* requirements," *i.e.*, that there was custody and interrogation, is on the defendant. *Id.* at 520, 974 A.2d 991.

*State v. Thomas*, 202 Md. App. 545, 565 (2011), *aff'd*, 429 Md. 246 (2012) (alteration in original).

It is undisputed that Norwood was subjected to interrogation during the March 16 and March 18 interviews. Accordingly, we consider only whether Norwood was in custody. "'[W]hether a suspect is 'in custody' is an objective inquiry.'" *Id.* at 565 (quoting *J.D.B.*, *supra*, 131 S. Ct. at 2402). In *Thomas*, *supra*, we quoted from the United States Supreme Court's opinion in *J.D.B.*, *supra*, which explained as follows:

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and

14

actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

*Thomas*, *supra*, 202 Md. App. at 566 (quoting *J.D.B.*, *supra*, 131 S. Ct. at 2402 (quoting

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995))).

Courts consider multiple factors when determining whether a defendant is in custody, considering the totality of the circumstances. *Id.* at 567. The factors considered include:

> [W]hen and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning[,] whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation[,] whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* at 567-68 (alterations in original) (quoting *Owens v. State*, 399 Md. 388, 429 (2007)

(quoting *Whitfield v. State*, 287 Md. 124, 141 (1980))).

In the present case, the trial court determined that *Miranda* rulings were required at approximately fifty-two minutes into the March 18 interview. The trial court concluded that Norwood was not in custody when she spoke to detectives on March 16 and during the initial

15

portion of the March 18 interview.  With respect the March 16 interview, the trial court ruled as follows:[10]

> The fourth statement that is the subject of challenge is contained in the video recorded on March 16 which was taken at police headquarters.  And during this period of time, at least in the initial part, the defendant, who was brought to the police station by family members and left with them at the end is fingerprinted and hair samples were obtained from her at that time.
>
> ***
>
> In fact, she chatted quite amiably with the evidence technicians.
>
> ***
>
> It was amiable.  She was animated.  She was polite.  She didn't appear to be intimidated by anything that happened.
>
> And then the interview that takes place afterwards -- you know, I'll remark to you, another thing that was just -- it was uncanny to me -- besides the facility with which she answered questions, having been a prosecutor and defense attorney for many years before coming on the bench and now being on the bench and watching videos for many years, I've seen instances where the police were interrogating a suspect and then they get up and leave and the camera is still running.
>
> And you see defendants picking at themselves, moving around, jumping around, standing up, pounding their fists.  I had to fast forward through several of the intervals when the police left the room on the 16th to see any movement in the defendant at all.  She didn't appear to be nervous.  She was composed.

---

[10] The trial court ruled on the issue of voluntariness as well as on the issue of *Miranda*.  Norwood does not raise any issues related to voluntariness on appeal.

Just, you know, to suggest from that that there was some overbearing of her will, that these officers were subjecting [her] to a pressure-filled situation where her will was overborne, to me is just almost -- it's almost absurd.

Again, the offering of detail that wasn't asked for.  The appropriate affect at times when emotions ought to be seen.  Even, you know, "Do you want a glass of water?"  I think those of us who have tried criminal cases always would tell people who we were defending, "Stop drinking the water.  You're making yourself look nervous here.  And you're going to have to go to the bathroom at some point."  She's offered beverages a couple of times and doesn't even want a glass of water.

And you know, I mean, these thing[s] by themselves are not dispositive.  But when you put them together, it just indicates to me a person who is totally in control of [the] situation.  At least as far as March 16, I think -- and who knows, this is just surmising, and I'm candid to admit that -- she thought she had everybody duped.

So I don't find any *Miranda* violation on the 16th, you know, the bathroom, as [the prosecutor] pointed out, she got up and went to the bathroom.  I've been in and out of police stations.  You can walk right on through the door.  Right on through the door.  Bye-bye.

She came right back.  So the sense to me was that she knew that the police were continuing to investigate this crime.  She was going to play along with it to the extent that she could.  And of course, I'm not the trier of fact here.  I'm not convicting her of this crime.  This is for the purpose of the motions only.

But I am saying that, based upon what I saw, this was a young woman who was totally facile, totally with it, knew what she was doing, and was not being overborne by police conduct.  So as to the voluntariness of the statement, I find the statement

voluntary under both tests and I find that *Miranda* does not apply because she was not in custody.

We agree with the trial court that Norwood was not in custody during the March 16 interview. Although the interview occurred at police headquarters, Norwood came to police headquarters voluntarily, accompanied by her brother and sister. The trial court found that Norwood spoke casually, calmly, and amiably and did not appear to be intimidated. Based upon our review of the video recording, we agree with the trial court's findings regarding Norwood's demeanor. Although the interview occurred in a police interview room, the two doors to the room were left open at various times throughout the interview. When Norwood requested to use the restroom, she was shown to an employee restroom on the same hall through which Norwood entered. The same hallway had doors which led to the outside of the building, through which Norwood could have exited.

Although Detective Drewry acknowledged that he had begun to view Norwood as a suspect prior to the March 16 interview, he was careful not to convey his suspicions to Norwood. The circuit court explained:

> [T]he test for *Miranda* is an objective one. And [Detective Drewry] did a pretty darn good job of not conveying [his suspicions] to her in my view, because as I said in an offhand comment he made, he had me convinced, for instance, that he was hard of hearing. On several occasions during one of the interviews he says, "I can't hear you. You have to speak up." I though[t], well, maybe he's like me. He's getting old. He can't hear well. He says today that's really not true.
>
> But I didn't detect in watching the defendant that there was any sense on her part that he really was of the mind that we now

18

know he was. So while it may be true that as early as March 16 -- and maybe it was earlier. Maybe [defense counsel] is right, that the police were suspicious. It's still an objective test as to what Ms. Norwood believed and I don't see any evidence at all that Ms. Norwood believed that she was in custody. And again, I guess the litmus test is at the end of March 16, she left. Not in handcuffs. She left.

Our review of the video recording leads us to agree with the trial court that Detective Drewry did not convey his suspicions to Norwood in any way. Furthermore, as the circuit court properly found, Norwood was permitted to leave with her brother and sister at the end of the interview.

We are unpersuaded by Norwood's contention that she was in custody because at one point she told the detectives she did not want to talk anymore. Norwood expressed concern about answering questions posed by the detectives, saying that she was afraid of the two men who had attacked her at the Lululemon store. After Detective Drewry reassured Norwood that the attackers were "a million miles away" and that she did not need to be afraid of the attackers, Norwood agreed to speak with the detectives further. Through this exchange, Norwood appears to have been attempting to convince the detectives to believe her story regarding the two attackers. In our view, this exchange does not indicate that Norwood believed that she was not free to leave.

Based on the totality of the circumstances, we hold that the circuit court did not err when it concluded that Norwood was not in custody at any point during the March 16 interview. Although the total time Norwood spent at police headquarters was somewhat

19

lengthy,[11] that time frame included time when Norwood was chatting casually with detectives while waiting for the evidence technicians. Furthermore, the time frame included time for the collection of hair samples and fingerprints. Throughout the interview, Norwood acted as a victim and appeared to think that she had convinced the police to believe her story. Norwood was not restrained and was not prevented from exiting the building at any time. Finally, Norwood left police headquarters and returned home with her family at the conclusion of the interview. For all these reasons, we agree with the trial court that Norwood was not in custody.

We reach the same conclusion with respect to the initial portion of the March 18 interview.[12] The trial court ruled that Norwood was not in custody during the first approximately fifty-two minutes of the March 18 interview. The trial court observed that the March 18 interview was arranged at Norwood's request because a family member telephoned the detectives on March 17 and told them that there was additional information that Norwood wanted to share with them. The detectives agreed to schedule an additional interview on March 18 rather than on March 17 because that date was more convenient for Norwood.

---

[11] The video recording indicates that Norwood was in the interview room for approximately two hours and fifty minutes.

[12] We express no opinion on whether Norwood was in custody for *Miranda* purposes after the first approximately fifty-two minutes of the March 18 interview.

20

The trial court explained its ruling as follows:[13]

> So then we get to [March] 18th . . . this is at the request of either the defendant or members of her family. And again, I noted, because there was some small talk in the beginning. And suddenly, she jumps right into it and says, "All right, I'm here because . . ."

> And she starts to explain why she's there. Because there was some information she hadn't provided to them again.

> There is this conversation about her moving to Seattle. And what I also noted here is -- and I guess this is maybe to sort of be able to fudge things, continually when she would describe what had purportedly happened, she would say like in response to a question -- I'll give you an example. This is not verbatim, but like, "well, did you see him?" And she would say, "I feel like," or "I want to say," and I made note of how many times she said that. "I feel like" such and such happened. Or "I want to say" such and such. You know, it all just came across as very calculated. And again, I do not sit here as the trier of fact in this case. A jury is going to decide this case.

> But I only offer it because to me in determining whether this statement was voluntary or not, it occurs to me that the control that she takes and manner in which she expresses herself is just very, very key. And with that viewpoint, it bolsters the argument the State is making here that these statements were voluntary simply because she really perceived herself to be in control of the situation and objectively, at least, because we don't know what was going on in her mind, and I'm not suggesting I do -- objectively at least, she gave that appearance.

---

[13] The trial court issued its ruling with respect to voluntariness in addition to *Miranda*. Although we do not address the voluntariness issue on appeal, we include certain observations made by the trial court which are relevant to both voluntariness and the *Miranda* issues.

And it was not until . . . towards the end of that session on March 18, objectively to me it appeared for the first time that she perhaps was getting a little bit uncomfortable about why this questioning was persisting.

And -- bear with me one second. It's at that point she says, "We've been over this." And Detective Drewry says, "I'm just trying to get it as straight as possible." And then there's another "And I want to say," in response to a question that I've noted here. But then the interview doesn't last much longer, and then she does say, "Can I go?" And Detective Drewry says "probably in a couple of minutes." And that's where the break is taken and the State has conceded that thereafter *Miranda* should have been administered.

\*\*\*

But I do find that the statement that was given in the morning, 10:52 to 11:44 to be voluntary under both tests. Again, I do not think she was in custody.

\*\*\*

But out of an abundance of caution, I'm going to exclude on a *Miranda* basis, that testimony that occurred after she said, "We've been over this." I think it's really, to be candid with you, very little . . . [O]ut of an abundance of caution and in fairness[.]

\*\*\*

It's going to be [suppressed] from the point where [Norwood] says, "We've been over this."

Again, we are in agreement with the trial court that Norwood was not in custody during the relevant portion of the March 18 interview. The interview was scheduled at Norwood's request, when Norwood realized that there was information she had omitted

22

during the previous interview. Norwood arrived at police headquarters for the interview with her brother and sister, and initiated the conversation, saying "All right, I'm here because . . . ." Norwood appeared to believe that she was in control of the situation throughout the relevant portion of the interview. Accordingly, based upon the totality of the circumstances, we hold that the trial court did not err by concluding that Norwood was not in custody during the relevant portion of the March 18 interview.

## II.

Norwood further contends that a police officer's testimony regarding a cut on Norwood's hand constituted inappropriate opinion testimony under *Ragland v. State*, 385 Md. 706 (2005). Norwood contends that the trial court erred in admitting an expert opinion that was based upon the officer's "specialized training and experience as any army medic" without providing the defense with required notice. We are unpersuaded.

We review a circuit court's decisions to admit or exclude evidence applying an abuse of discretion standard. *Kelly v. State*, 392 Md. 511, 530 (2006). The Court of Appeals has explained:

> Trial judges are afforded broad discretion in the conduct of trials in such areas as the reception of evidence. Accordingly, in our appellate review, we extend the trial court great deference in determining the admissibility of evidence and will reverse only if the court abused its discretion.

*Id.* at 530 (internal quotations and citations omitted). "[O]nce a trial court has made a finding of relevance, we are generally loath to reverse [the] trial court unless the evidence is plainly

23

inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion." *Decker v. State*, 408 Md. 631, 649 (2009) (alteration in original) (internal quotation and citation omitted).

"'[A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.'" *Alexis v. State*, 437 Md. 457, 478 (2014) (emphasis omitted) (quoting *North v. North*, 102 Md. App. 1, 14 (1994)). "Rather, '[a] court's decision is an abuse of discretion when it is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Id.* (quoting *Gray v. State*, 388 Md. 366, 383 (2005) (quoting *Dehn v. Edgecombe*, 384 Md. 606, 628 (2005)) (some internal quotation marks omitted)).

At trial, Officer Colin O'Brien testified for the State. Officer O'Brien was working part-time for Suburban Hospital doing security work as a uniformed police officer on March 12, 2011. He met the ambulance in which Norwood was riding, followed her stretcher into the trauma bay, and began bagging her clothing for evidence. Officer O'Brien observed cuts on Norwood's chest, legs, arms, and forehead. He particularly noticed a one to two-inch cut on the palm of Norwood's right hand. Officer O'Brien explained that his attention was drawn to that cut because it was typical of a common injury caused when a blade slips from one's grip and slides down the hand. Critically, that portion of Officer

O'Brien's testimony was stricken by the trial court. The trial court instructed the jury as

follows:

> THE COURT: All right. Ladies and gentlemen, you just heard
> testimony from the witness as to how this particular type of
> injury struck him as to how he thinks it happened, you are
> instructed to disregard that conclusion. You can certainly judge
> the credibility of the witness with regard to the other part of his
> statement as to what he saw, but not as to what he thinks that
> meant or how it was caused.

At the bench, the trial court stated that Officer O'Brien was not "qualified to say how

that injury occurs" but permitted the State to lay a foundation for Officer O'Brien's

knowledge about knife injuries. Thereafter, Officer O'Brien testified regarding his

experience with knife injuries as an Army medic. Officer O'Brien testified:

> [Officer O'Brien]: A lot of times you can see knife injuries,
> particularly when you cause them to yourself, that are
> lacerations that are straight to the hand that was holding the
> blade. They tend to be clean and typically will run parallel to
> the thumb.
>
> * * *
>
> [The Prosecutor]: When you observed these injuries occur and,
> could you tell exactly how that, how you observed those injuries
> that, that went parallel to the thumb with the knife, how did it
> occur?
>
> [Officer O'Brien]: The blade would slip through a grip and slide
> down the hand.
>
> [The Prosecutor]: Now, when you observed Brittany Norwood,
> on March 12th of 2011, can you describe the injury you saw on
> her thumb?

25

[Officer O'Brien]: There was an approximately one to two inch laceration on her, on her hand that ran parallel to her thumb.

[The Prosecutor]: And can you describe how it, how it appeared in relation to the knife injuries that you had observed in the past that you've just described to us?

[Defense Counsel]: Objection, Your Honor. Can we, again, approach just to put something on the record?

At the bench, defense counsel argued that he was "entitled to notice if they're going to elicit an expert opinion from someone in terms of how these injuries occurred." The trial court inquired as to the relevance of the evidence, and the prosecutor, apparently anticipating that the defense might advance a theory of voluntary manslaughter based upon a mutual affray, answered that counsel had referred in opening statement to "a mutual affray" between Norwood and Murray. The prosecutor argued that the cause of the injury would be relevant to whether a mutual affray in fact occurred. With respect to any opinion testimony by Officer O'Brien, the prosecutor argued that Officer O'Brien's testimony was not expert testimony because "it's not outside the realm of an average person's ability to, to use everyday life experience and observe knife wounds."

The trial court did not permit Officer O'Brien to testify as to the cause of Norwood's injury, commenting that any testimony would include "conclusions as to how [the cut] happened." The court ruled that Officer O'Brien "can certainly testify he's seen this type of wound before and he saw this one. He's described what it is, so let's move on from that, then." The prosecutor moved to a different line of questioning and did not return to the issue.

26

Norwood asserts on appeal that Officer O'Brien's testimony was impermissible under *Ragland*, *supra*, 385 Md. 706. In *Ragland*, the Court of Appeals distinguished between expert and lay opinion testimony, explaining:

> Expert opinion testimony is testimony that is based on specialized knowledge, skill, experience, training, or education. Expert opinions need not be confined to matters actually perceived by the witness. Lay opinion testimony is testimony that is rationally based on the perception of the witness.

*Id.* at 717.

The *Ragland* Court held that police officers' testimony characterizing a particular series of observed events as a "drug transaction" was expert testimony because the characterization was based upon the officers' specialized knowledge, experience, and training. *Id.* at 726. The Court explained that "among the numerous possible explanations for the events [observed by the officers] on Northwest Drive, the correct one was that a drug transaction had taken place." *Id.*

In contrast to expert testimony, lay opinion testimony requires no specialized knowledge or experience but instead is "derived from first-hand knowledge" and is "rationally based." *Bruce v. State*, 328 Md. 594, 630 (1992). For example, we have explained that an opinion regarding the odor of marijuana is lay opinion rather than expert testimony. *In re Ondrel M.*, 173 Md. App. 223, 243 (2007) ("No specialized knowledge or experience is required in order to be familiar with the smell of marijuana. A witness need

27

only to have encountered the smoking of marijuana in daily life to be able to recognize the odor.").

First, we observe that Officer O'Brien never offered any opinion, lay or expert, regarding the cause of Norwood's hand injury. His testimony regarding the cause of Norwood's injury was stricken by the trial court and the jury was instructed not to consider "how [Officer O'Brien] thinks [the injury] happened." Rather, Officer O'Brien testified about injuries he had observed in the past from slipped knives and described the injury he observed on Norwood's hand.

Furthermore, assuming *arguendo* the testimony was improper, our review of the record indicates that the error would be harmless beyond a reasonable doubt. *See Bellamy v. State*, 403 Md. 308, 332 (2008) ("Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict.") (internal quotation and citation omitted). The evidence of Norwood's guilt was overwhelming. Indeed, Norwood conceded that she intentionally killed Murray by repeatedly stabbing her with a knife and assaulting her with various other objects. Given Norwood's concession, the only issue before the jury was whether Norwood acted with premeditation.[14] Evidence suggesting that the knife slipped in

---

[14] Although the State at one point argued that the evidence regarding the knife would be relevant to rebut a defense theory of voluntary manslaughter based upon the legally adequate provocation of a mutual affray, the defense never sought a voluntary manslaughter instruction.

Norwood's hand during the attack is irrelevant to whether Norwood acted with premeditation.[15]

Even if the testimony were relevant to premeditation, there is overwhelming evidence that Murray's murder was premeditated. Dr. Mary Ripple, the Deputy Chief Medical Examiner, testified that Murray had at least 331 distinct injuries, including 105 defensive wounds. Dr. Ripple explained that Murray was alive for much of the assault. The time that it took Norwood to inflict 331 injuries strongly supports a finding of premeditation. Dr. Ripple further testified that Murray's injuries were caused by at least five weapons, including a wrench, a merchandising peg, a hammer, a box cutter, and an x-acto knife. The time that it took Norwood to gather the weapons from various locations in the store further supports a conclusion that Murray's murder was premeditated. Finally, we note that employees of the neighboring Apple Store heard sounds of a confrontation coming from the Lululemon store and listened at the wall for approximately nine minutes. In light of the overwhelming evidence of premeditation presented at trial, any alleged error regarding Officer O'Brien's testimony was harmless beyond a reasonable doubt.

For the foregoing reasons, we hold that the trial court did not err in denying Norwood's motion to suppress the statements she made to the police on March 16 and 18,

---

[15] We are unpersuaded by Norwood's contention that the State, in closing argument, highlighted Officer O'Brien's testimony as evidence in premeditation. Our review of the record indicates that the State referenced Officer O'Brien's testimony only to support the argument that Norwood was wielding a knife and had killed Murray, and that Norwood's injury was self-inflicted.

2011. We further hold that the trial court did not abuse its discretion by permitting a witness to testify about a laceration he observed on Norwood's hand and about knife wounds he had seen in the past. Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**