REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 2105
September Term, 2014

_____

LABRIA PAIGE

v.

STATE OF MARYLAND

_____

Wright,
Graeff,
Moylan, Charles E., Jr.
  (Retired, Specially Assigned),

JJ.

_____

Opinion by Wright, J.

_____

Filed:  November 30, 2015

Appellant, Labria Paige, was convicted by a jury in the Circuit Court for Howard County, Maryland, of theft under $1,000.00 in connection with a shoplifting case. After she was sentenced to 18 months, with all but six months suspended, appellant timely appealed and presents the following questions for our review:

1. Did the motions court err in denying Appellant's motion to suppress a statement obtained in violation of *Miranda*?[1]

2. Did the trial court abuse its discretion in permitting Loss Prevention Officer Salley to narrate the events depicted in the Macy's closed-circuit camera footage?

For the following reasons, we shall affirm.

## BACKGROUND

### Motions Hearing

On April 14, 2013, Thea Salley, a loss prevention agent with the Macy's Department store located in the Columbia Mall, testified that appellant and two juveniles were stopped by Macy's loss prevention agents as they exited the store carrying concealed merchandise. Because appellant fought with the loss prevention agents in the Macy's parking lot, the agents handcuffed her, for her safety as well as their own.

Appellant and the two juveniles were then escorted to the Macy's loss prevention office, located in an area of the store that otherwise was not accessible to the general public. Salley testified that the dimensions of the office was equal to half the size of the well in the courtroom, or approximately 20 feet by 20 feet. The room was well lit, and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

there were no police insignia located anywhere within the room. Further, there was one door to the office, and that door was closed during Salley's interview with appellant.

Salley stated that, as a loss prevention officer, she worked for Macy's, a retail store that is "not affiliated with any government organization." Salley testified that her office was "not a police department," and that loss prevention officers are not "endowed with arrest powers," nor are they "police officers themselves." According to Salley, during her six years at Macy's, she was never "affiliated with any law enforcement agency" and never worked for the Howard County Police Department or any other police department.

When appellant and her two companions initially arrived in the office, they were met by Salley and three other Macy's loss prevention officers. At that time, while Salley was attempting to get everything "sorted out," appellant admitted that the two juveniles were under her care and that, according to Salley, "she was taking all the blame for anything that they – that the two juveniles did." Salley also testified:

> Ms. Paige was frightened that the two juvenile teenagers that was with her, she was frightened that she would be in trouble by the parents of the children because they was under her custody. She was – they were hanging out with her is what she said and she wanted all the blame to go on herself because she didn't want the parents of the children to try to, you know, harm her or – and/or threaten her. So, she repeatedly said, "I did it. I did everything. I did everything. Don't involve them. Don't get them in trouble."

At a later point, Salley called the Howard County Police, informed them of the theft, and asked them to respond to the store. Salley testified that the police ordinarily were called anytime there was a shoplifting case where the value of the goods exceeded

2

$50.00. Salley agreed that she called the police so that appellant would ultimately be charged in connection with the theft. She also stated that she had called Howard County Police about sixteen times in the past month and that equaled the average number of calls Macy's would make on a monthly basis.

Officer Kristian Bush, of the Howard County Police Department, arrived at approximately 2:10 p.m.[1] Thereafter, at around 2:48 p.m., and after appellant's handcuffs had been removed, appellant signed a Macy's statement of admission form, a Macy's trespass notification form, and a Macy's civil demand notice.

Salley agreed that Officer Bush was present when these forms were signed. At the time, Officer Bush was standing near the door, up against a wall. Salley confirmed that Officer Bush did not handle the Macy's forms, and that she handed the forms over to appellant. In addition, Officer Bush never handcuffed appellant, nor did he ever threaten her. And, according to Salley, Officer Bush never spoke to appellant about the Macy's forms and never told her that she needed to talk in order to avoid arrest. Salley further testified that she did not tell Officer Bush about appellant's earlier oral admission of guilt. After appellant signed the Macy's forms, she was temporarily transferred to the custody of Officer Bush, who released her shortly thereafter.[2]

---

[1] Salley testified that appellant's oral admission of guilt was made before Officer Bush arrived in the loss prevention office. She maintained that the office, itself, was not affiliated with the Howard County Police and was the property of Macy's.

[2] According to Salley's testimony, appellant was released from the store without being arrested and then taken back to a central booking facility.

In addition to Salley, Officer Bush also testified at the motions hearing, but he provided very limited details about the interview with appellant. He confirmed that he met with Salley on the day in question and went to the loss prevention office. However, when asked if he saw Salley direct anyone to sign any papers in his presence, the officer replied that he was "not sure," and "I didn't notice that." Officer Bush then concluded his brief testimony by stating: "I believe the – the three suspects that were in custody signed papers, and I'm not sure of the papers."

After testimony concluded, defense counsel moved to suppress any statements appellant made after Officer Bush arrived in the Macy's loss prevention office. Counsel's argument was that the presence of the police officer, as well as the other circumstances surrounding the interview, established that appellant was in custody when she signed the written admissions of guilt and that those statements should be suppressed. The State responded that any statements appellant made were not made to State agents because the Macy's employees were not working as agents of the police. Further, the State contended that Officer Bush was merely present and did nothing to either further the interview or to suggest that appellant was in custody.

In denying the motion to suppress, the circuit court found that, after Macy's employees observed an apparent shoplifting, they took appellant "into their custody based on a – what they observed." Appellant was handcuffed by Macy's personnel and then taken to the loss prevention office at the store. The court further found that there was no dispute that appellant gave an oral admission of guilt, and that statement was made before the police officer, Officer Bush, arrived.

4

The circuit court then found that, after Officer Bush arrived, he did not take appellant into police custody, he did not handcuff her, he was not aware of the prior oral admission, and he did not make "any inquiries of the defendant concerning any statement or – or the signing of any documents by the defendant." The court also found that, although Officer Bush was present in the loss prevention office when appellant signed the written admissions, he did not "seem to be taking any sort of an active role" in the investigation. In fact, the court found that Officer Bush "wasn't entirely aware of exactly what the paperwork was" and that "their decision to present the paperwork to the defendant was not at Officer Bush's suggestion or direction."

The circuit court then concluded as follows:

> So, clearly, you have custody, but it's not police custody. It's Macy's custody. And I don't find that – that the Macy's personnel were acting on behalf of Officer Bush or the Howard County Police Department. The Macy's personnel clearly are not state agents or actors. The arrest was by Macy's. No participation in the arrest by Officer Bush. The handcuffs were Macy's. The Macy's loss prevention room is not a Howard County Police facility.

> There is no indication Officer Bush made any gestures or statements to the defendant or about the defendant within earshot of the defendant to manipulate her into signing the subject documents.

> So, the – I find that the defense has not met its burden of demonstrating that there was a Howard County Police custody or interrogation by Howard County Police or some actors acting on the – for the benefit of the Howard County Police Department or for – or based on any sort of encourage [sic] or direction of the Howard County Police Department.

> So, I find that the defense has not been able to meet its initial burden of demonstrating that this was a police custody or police interrogation, and I'll deny your motion.

5

**Trial**

On April 14, 2013, at around 1:30 p.m., Salley was working as a loss prevention officer at the Macy's inside the Columbia Mall. While observing the broadcasts from the approximately 97 closed circuit televisions located throughout the store, Salley saw a man roaming around in the women's department. Testifying that this was "kind of unusual," she watched the man approach three female individuals, which included appellant, a 14-year-old, and a 16-year-old. One of these three was carrying a large Downtown Locker Room bag, and another was carrying a black handbag.[3] All three were making "random selections" of merchandise from the racks without looking at either the price tag or the sizes of the respective items. They would drape this merchandise over their arms, concealing the contents of the bags. Salley identified appellant, in court, as one of these three individuals.

Salley watched as appellant selected a leather jacket, a yellow shirt, and some leggings, and then threw them over her arm. Then, appellant and the other two juveniles went to the fitting rooms. There, all three of them went inside a single stall. Testifying that the stall was a "small room," Salley indicated that the three individuals remained in the stall for ten minutes.

Salley provided more detail in court as she testified along with a recording of surveillance video that was played for the jury. After watching the man approach

---

[3] Downtown Locker Room was a separate store in the Columbia Mall that was not affiliated with Macy's.

appellant and the other two juveniles, Salley watched them on multiple cameras, from multiple angles, walking around the women's department. Salley saw six items of merchandise in appellant's possession at this time, and she also testified that one of the other juveniles was carrying the large Downtown Locker Room bag. The three individuals continued walking around the department, working their way towards the fitting rooms, gathering merchandise along the way. After the man again appeared in the video nearby, appellant and the two juveniles then took "a lot of merchandise" into the handicapped stall located in the fitting room, where they remained for approximately ten minutes.

Because there were no cameras in the fitting room stall, Salley left her post in the loss prevention observation room and went to the fitting room area. She then entered a stall that was located opposite the one occupied by appellant and the juveniles. Salley was able to see into this other stall because there were broken slats on the bottom of the door. As she crouched down to get a better view, Salley observed "the merchandise going into the black bag and the Downtown Locker Room bag." And, Salley specifically saw appellant placing items into the Downtown Locker Room bag.

Salley then testified that, while she was inside the adjacent stall, she heard the man she had seen before call out, and appellant and the two juveniles then emerged from their stall, exiting together and carrying a few items. After appellant and the juveniles placed a few of these items down, Salley saw that one of the other, unidentified juveniles was carrying the Downtown Locker Room bag. Over objection, Salley testified that the bag had been filled because it was larger than it was before the three of them first took the

bag into the stall. After the appellant and the two juveniles walked away, Salley entered the stall in question and noticed that, although appellant originally entered with six items of merchandise, only two items remained behind.

Salley then emerged from the fitting room and watched as appellant proceeded past approximately twelve cash registers, without paying, towards a store exit. After appellant and her companions walked out the door, Salley called out a code on her radio that instructed other loss prevention officers to stop and detain appellant and her companions "[b]ecause they left the store with merchandise that was unpaid for."

Appellant was apprehended near the curb outside Macy's carrying the Downtown Locker Room bag. There ensued a "lot of tussling and fighting and profanity." Salley explained that she identified herself and told appellant that she needed to come back inside the store to discuss the merchandise, but appellant attempted "to run and fight."

Thereafter, after she was escorted to the loss prevention office, appellant verbally admitted that she stole the Macy's merchandise in question. Appellant also signed a Macy's trespass notice, a Macy's civil demand notice, and a Macy's statement of admission. The trespass notice forbade appellant from entering any Macy's for three years. And, the civil demand notice let appellant know the amount of restitution owed to Macy's for the stolen items.

As for the Macy's statement of admission, that form not only listed the specific items of merchandise that had been taken, but also included appellant's admission that "I did take merchandise and/or cash belong to Macy's valued at $673.98 without consent or permission and with the intent to permanently deprive Macy's of their property." Salley

8

testified that she had personally witnessed appellant take many of the listed items while inside the store. She also saw appellant attempt to leave without paying for them. The items, with their anti-theft sensors still attached, were ultimately found inside the Downtown Locker Room bag. Salley further testified that the bag was lined with aluminum foil which was significant because lining a bag in this way could defeat the sensor alarms located near the exits of the store.

Appellant testified in her defense that her boyfriend, Brandon Wilder, drove her and the two other juveniles to the Columbia Mall on the date in question in order to buy clothes. Appellant agreed that she went into the fitting room with the two juveniles and watched as they tried on some of the clothes. Appellant had brought some of the items into the fitting room and then left some behind when the three of them left.

After leaving the fitting room, appellant and the two juveniles met up with Wilder and then walked out of Macy's. Appellant testified that one of the two juveniles was carrying a bag at the time. Appellant denied leaving the store with anything in her hands.

At that point, appellant was apprehended by three men. The three men were not in uniform, did not have identification badges, and did not identify themselves to her.[4] After the men told her she needed to go back inside Macy's, because someone had stolen merchandise, appellant complied, but the woman who had the bag resisted. Appellant maintained that she did not know about, and was not involved with, the shoplifting.

---

[4] At around the same time, appellant watched as her boyfriend sped away from the scene in his car.

Appellant was taken to a small room, where she and the two juveniles were interviewed by three or four men, as well as Salley and a police officer. During the course of the interview, Salley gave appellant the forms and told her to sign them. Appellant testified that she had a prior theft case and had vowed never to steal again, so she initially refused to sign.[5] At that point, Salley told her that if she did not sign, she would be turned over to the police officer. Appellant, who was pregnant at the time, needed to go pick up her four-year-old daughter from school that afternoon, so she testified she agreed to sign the papers because "I had no choice." She maintained that she did not steal anything from Macy's on the day in question.

We shall include additional detail in the following discussion.

**DISCUSSION**

**I.**

Appellant first contends the circuit court erred in denying the motion to suppress her written statements because she was in custody for *Miranda* purposes when she gave those statements. The State responds that appellant was not in custody because the Macy's loss prevention agents were not acting as State agents at the time of the encounter. We agree.

In reviewing the motions court's decision on a motion to suppress, we are limited to the facts developed at the hearing, *Hill v. State*, 418 Md. 62, 67 n.1 (2011), viewing the

_____

[5] Appellant was convicted of theft less than $1,000.00 on November 1, 2012.

evidence in the light most favorable to the prevailing party on the motion. *Robinson v. State*, 419 Md. 602, 611-12 (2011); *accord Gonzalez v. State*, 429 Md. 632, 647 (2012). We review the motions court's factual findings for clear error, but we make our own independent constitutional appraisal, "reviewing the relevant law and applying it to the facts and circumstances of this case." *State v. Luckett*, 413 Md. 360, 375 n.3 (2010) (citation omitted); *accord Moore v. State*, 422 Md. 516, 528 (2011). The issue of whether a confession is voluntary presents a mixed question of law and fact, subject to *de novo* review, with deference given to the suppression court's factual findings. *Winder v. State*, 362 Md. 275, 310-11 (2001).

In Maryland, a confession may be admitted against an accused only when it has been "determined that the confession was '(1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda*.'" *Ball v. State*, 347 Md. 156, 173-74 (1997) (quoting *Hof v. State*, 337 Md. 581, 597-98 (1995)); *accord Knight v. State*, 381 Md. 517, 531-32 (2004); *Smith v. State*, 220 Md. App. 256, 273 (2014), *cert. denied*, 442 Md. 196 (2015).

Appellant's claim is grounded in an alleged *Miranda* violation. Pursuant to *Miranda* and its progeny, the police are required, when they detain a person for questioning in a custodial setting, to inform the person of several rights including

> the right to remain silent, that anything the person says may be used in evidence, that the person has a right to consult with an attorney before responding to questioning, and that an attorney will be

appointed  if the person is indigent . . . .  [A]n inculpatory statement elicited in violation of that requirement is inadmissible in the State's case-in-chief. *See Dickerson v. U.S.*, 530 U.S. 428, 120 S. Ct. 2326, 1147 L.Ed.2d 405 (2000).

*Phillips v. State*, 425 Md. 210, 212 (2012) (footnote omitted).

The *Miranda* requirements, however, apply only to custodial interrogation.  *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401-02 (2011).  This is due to the Supreme Court's recognition that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).  Therefore, "before a defendant can claim the benefit of *Miranda* warnings, the defendant must establish two things: (1) custody; and (2) interrogation." *State v. Thomas*, 202 Md. App. 545, 565 (2011) (citation omitted), *aff'd*, 429 Md. 246 (2012).  *Accord Smith  v. State*, 186 Md. App. 498, 518 (2009), *aff'd*, 414 Md. 357 (2010).  And, the burden of "showing the applicability of the *Miranda* requirements," *i.e.*, that there was custody and interrogation, is on the defendant.  *Smith*, 186 Md. App. at 520.

In suggesting that appellant has not met her burden, the State contends that she was not in custody when she was interrogated by the Macy's loss prevention agents.  Some commentators have addressed this issue:

> The Supreme Court has emphasized that constitutional rights protect against governmental infraction.  In 1986 in *Colorado v. Connelly*, [479 U.S. 157 (1986)], the Supreme Court ruled that, in order for a confession to be suppressed under the constitutional due process test of voluntariness, "coercive police activity is a predicate."  The *Connelly* Court concluded: "Even the most outrageous behavior by a private party seeking to secure

evidence against a defendant does not make that evidence inadmissible under the Due Process clause." Some form of police interrogation is similarly required to trigger the *Miranda* protections of the Fifth Amendment.

Jezic, et al., *Maryland Law of Confessions* § 10:1 at 437-38 (2014-2015 ed.) (footnotes omitted) (hereinafter "*Law of Confessions*").

And:

In the *Miranda* case the Court defined interrogation as "questioning initiated by law enforcement officers." Because of this and also because of the general doctrine that state action is a prerequisite to application of constitutional protections, it is clear that *Miranda* does not govern interrogation by private citizens acting on their own.

2 LaFave, Israel, et al., *Criminal Procedure* § 6.10(b) at 871-72 (3d ed. 2007) (footnote omitted) (hereinafter "*Criminal Procedure*").

There is little case law in Maryland addressing when or whether the *Miranda* advisements are necessary when it is alleged an encounter involves a non-State actor. In *Pratt v. State*, 9 Md. App. 220 (1970), William C. McKinley worked as a security officer for Montgomery Ward, Incorporated, in Prince George's County. In fulfilling this role, McKinley swore an oath to perform his duties and was appointed by the Governor in order to protect the property of the establishment. *Id.* at 220. On October 8, 1970, McKinley saw Bernard Pratt climb onto a Montgomery Ward's department store's loading dock and start to move a box towards the edge. *Id.* at 221-22. After he hollered for Pratt to stop, a chase ensued inside the store, and Pratt, apparently carrying a box of stolen merchandise, was ultimately stopped by McKinley and taken to the store security office. *Id.* at 222. The box contained a sewing machine worth approximately $170.00.

*Id.* At trial before a jury, and over objection, McKinley testified that he asked Pratt "if he was going to sell the sewing machine and he said no, he was going to keep it." *Id.*

The issue on appeal was whether McKinley was acting as a law enforcement agent such that admission of Pratt's statement was in violation of *Miranda*. The Court agreed with Pratt that the statement was improperly admitted. *Pratt*, 9 Md. App. at 226-27. McKinley had testified that he was a sworn, and appointed, law enforcement officer, pursuant to then Sections 342-348 of former Article 23. *See* Md. Code (1957), Art. 23, §§ 342-48 (superseded). Pertinent to its discussion, former Section 344 authorized policemen appointed under these provisions to exercise "all the authority and powers held and exercised by constables at common law and under the statutes of this State, and also all the authority and powers conferred by law on policemen in the City of Baltimore." Article 23 § 344 (superseded).

This Court agreed that this designation of powers meant that McKinley was performing his duties as a State actor. The Court observed:

> "If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law."

*Pratt*, 9 Md. App. at 226 (quoting *Griffin v. State of Maryland*, 378 U.S. 130, 135 (1964)).

This Court concluded:

> With regard to the issue of the admissibility of the statement, the court could not have properly concluded, on the evidence before it, other than that McKinley was appointed and qualified as a policeman as provided by law, and purported to act under that authority when he took appellant in

14

> custody. We find it crystal clear that McKinley was a 'law enforcement officer' within the meaning of *Miranda*.
>
> As the statement of appellant was obtained by a law enforcement officer initiating questioning of him while he was in custody without the employment of the procedural safeguards required by *Miranda*, its introduction in evidence was reversible error.

*Pratt*, 9 Md. App. at 226.

The role of private security guards in Maryland has also been addressed in cases decided under the Fourth Amendment. For instance, in *Waters v. State*, 320 Md. 52 (1990), on the evening of May 16, 1988, while Paul Madden was working as a licensed security guard at a private establishment in Anne Arundel County, he accosted Waters, apparently at gunpoint, as Waters was leaning against a vehicle in the parking lot. During the encounter, Madden removed a beer can and a plastic bag containing a whitish substance from Waters's pocket. *Waters*, 320 Md. at 54. Madden called Anne Arundel County police, and Waters was arrested and charged with possessing cocaine. *Id.* at 54-55.

Waters moved to suppress the cocaine, contending that Madden was acting as an agent of the police and that the arrest and search were unlawful under the Fourth Amendment. *Waters*, 320 Md. at 55. Waters maintained that because privately licensed security guards, just like special police officers commissioned by the Governor, perform duties similar to those of regular police officers, he was subject to illegal state action. *Id.* at 56.

The Court of Appeals disagreed and affirmed Waters's conviction. The Court began its analysis as follows:

15

The Fourth Amendment of the United States Constitution guarantees the right of individuals to be secure against unreasonable searches and seizures. It applies to actions by the State, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961), but generally does not apply to actions by private individuals. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Burdeau v. McDowell*, 256 U.S. 465, 467, 41 S.Ct. 574, 574, 65 L.Ed. 1048 (1921). Thus when a private individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the accused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial. *Bowers v. State*, 298 Md. 115, 139-40, 468 A.2d 101 (1983); *Herbert v. State*, 10 Md. App. 279, 284-85, 269 A.2d 430 (1970). A private search or seizure may, however, trigger Fourth Amendment protections if the private individual whose actions are in question, "in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state." *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971).

*Waters*, 320 Md. at 56-57.

The Court distinguished between private individuals employed as "special police officers" appointed by the Governor pursuant to statute, and individuals licensed as security guards by the Maryland State Police. *Waters*, 320 Md. at 57-59. Special police officers have "'and may exercise, the powers of a police officer upon the property,' including the power to preserve the 'peace and good order' of the property and to make arrests." *Id.* at 57 (quoting Md. Code (1986 Repl. Vol.), Article 41, § 4-905 (repealed)). Security guards, in contrast, do not have arrest or other police powers. *Id.* at 58. The Court explained that "[w]ithout governmental powers, security guards are acting as private citizens when protecting property, and their private status is not altered because their interest in protecting property coincides with the public's interest in preventing crime generally." *Id.* at 59.

The Court concluded that Waters had not met his burden of establishing a Fourth Amendment violation. *Waters*, 320 Md. at 59. He also did not prevail because, "[i]n the same vein, the burden of establishing government involvement in a private search rests on the party objecting to the admissibility of the evidence." *Id.* at 60 (citations omitted). As Madden was a licensed security guard and there was no evidence that he "was working in collusion with the police at the time of the search, or otherwise acted as an instrument of the State in the performance of his duties," the Court of Appeals agreed that the evidence was admissible and that the motion to suppress was properly denied. *Id.*

The commentators have further explained the distinction in Maryland law as follows:

> Special police officers are deemed state agents in the performance of their responsibilities.
>
> Unlike special police officers, security guards are not vested with arrest or other police powers . . . . Courts in Maryland have therefore determined that such private security guards are not state agents unless they are working under the direction of, or in concert with, law enforcement officers.

*Law of Confessions*, § 10:7 at 466.

And:

> [T]he courts have rather consistently held that such persons as security officers, store detectives, railroad detectives, insurance investigators, bank investigators, and private investigators are not required to comply with the *Miranda* procedures. A contrary result has sometimes been reached if the interrogator, though then serving private security functions, has been given police powers by a governmental unit.

*Criminal Procedure* § 6.10(b) at 873.

17

The record in this case persuades us that Salley and the other loss prevention officers at Macy's were private security guards, and were not special police officers, as that category of individual is understood under Maryland law. Salley did not have any arrest powers or other duties associated with typical law enforcement. Ordinarily in these circumstances, and as many courts recognize, private security guards are not required to give the *Miranda* warnings when interrogating an individual. *See Woods v. City Court of City of Tucson*, 626 P.2d 1109, 1110 (Ariz. Ct. App. 1981); *People v. Chastain*, 733 P.2d 1206, 1214 (Colo. 1987); *State v. Boyd*, 260 A.2d 618, 623 (Conn. Cir. Ct. 1969); *Singleton v. State*, 500 S.E.2d 411, 412-13 (Ga. App. Ct. 1998); *People v. Raitano*, 401 N.E.2d 278, 281 (Ill. App. Ct. 1980); *Owen v. State*, 490 N.E.2d 1130, 1135 (Ind. Ct. App. 1986); *City of Grand Rapids v. Impens*, 327 N.W.2d 278, 281 (Mich. 1982); *Silks v. State*, 545 P.2d 1159, 1161 (Nev. 1976); *State v. Kelly*, 294 A.2d 41, 43 (N.J. 1972); *State v. Giallombardo*, 504 N.E.2d 1202, 1204 (Ohio App. Ct. 1986); *State v. Petersen*, __ S.W.3d __, No. 11-14-00064-CR (Tex. Ct. App. July 16, 2015); *State v. Valpredo*, 450 P.2d 979, 981 (Wash. 1969); *see also In re Deborah C.*, 635 P.2d 446, 449 (Cal. 1981) ("That private security guards sometimes act under color of law when they conduct illegal searches neither makes them 'law enforcement officials' nor establishes the complicity of those officials for purposes of *Miranda*. It does not render their detention of shoplifting suspects 'police custody' nor their questioning 'official'"); *People in Interest of R.R.*, 447 N.W.2d 922, 926 (S.D. 1989) ("[A]bsent coordinate action or complicity between private security guards and the police, *Miranda* warnings need not be given to a suspect").

18

In arguing that the Macy's employees were actually acting as agents of the State, appellant directs us to *Peoples v. State*, 615 So.2d 1265 (Ala. Crim. App. 1992). In that case, Peoples entered a K-Mart with her two children and another unrelated juvenile child from her neighborhood. While she was in the shoe department, the unrelated juvenile was stopped on suspicion of shoplifting. Peoples was called to the front of the store and informed of these developments. *Peoples*, 615 So.2d at 1265-66. After disavowing any responsibility for this other child, Peoples began to walk away but was stopped after store personnel noticed that she not only was wearing new shoes from the shoe department, but that their tags had been removed. *Id.* at 1266.

Peoples and her children were then taken to the store security office, where they were interviewed by three store employees and a police officer in a very small room that could barely accommodate that number. *Id.* The police officer had responded to the store earlier due to the reported shoplifting by the juvenile and was asked by the loss prevention manager to attend the interview with Peoples. *Id.* In the presence of this police officer, Peoples was questioned about the new shoes she was wearing, as well as other items. *Id.* After Peoples confessed to stealing the shoes, the police officer, who had been relatively quiet during the interview, then began to question Peoples for purposes of completing a police report. *Id.* Following this inquiry, the officer told Peoples to turn herself in at a later time because she had small children with her. *Id.*

On appeal, and after recognizing the general rule that the Fifth Amendment protections ordinarily do not apply to questioning by private citizens, the Alabama

appellate court concluded that, under the facts of the case, Peoples should have been advised of her *Miranda* rights. *Peoples*, 615 So.2d at 1267. The Court observed:

> [I]n certain instances private conduct can become so entangled with government involvement that a reasonable person would find it difficult to distinguish one from another. In such a case, the question of whether one is entitled to the protections of *Miranda* cannot be answered merely by observing the relationship between the private citizen and the government official as they themselves see it. Our inquiry must focus on whether "the presence of the police and/or other circumstances indicate that the questioner is acting on behalf of the police." 1 W. LaFave & J. Israel, supra, § 6.10(b), p. 141 (Supp. 1991). "It is the impact on the suspect's mind of the interplay between police interrogation and police custody – each condition *reinforcing* the pressures and anxieties produced by the other – which creates 'custodial interrogation' within the meaning of *Miranda*."

*Id.* (emphasis in original) (citation omitted).

The Court then held that:

> In the present case, the police officer's involvement in the appellant's interrogation was not insignificant. The record indicates that the officer was present throughout the process. He had recently assisted in the arrest of the youngster who had accompanied the appellant to the store and was then asked by an employee to remain in the security office during the detention and the questioning of the appellant. Furthermore, the physical surroundings and conditions of the interrogation certainly emphasized the officer's presence. Under these circumstances, the appellant could have reasonably concluded that she was not merely answering the questions of the K-Mart employees, but the questions of the police officer as well and that, for all practical purposes, a police investigation was in progress. Therefore, the appellant was entitled to be advised of her rights under *Miranda* before being questioned. The trial court erred in allowing the appellant's confession into evidence.

*Id.*

We conclude that *Peoples* is distinguishable. Unlike that case, Officer Bush's role in appellant's interview was very limited. He was not involved when appellant was

20

stopped and handcuffed by Macy's employees. Nor did he interview appellant or ask her any questions. And there is no indication in the record that Officer Bush directed the private security guards in their actions in obtaining the written admissions from appellant. Thus, we conclude that the motions court was not clearly erroneous in ruling that Salley and the other Macy's employees were not agents of the State. And, we also conclude that Officer Bush's presence was not the equivalent of police custody so as to require the satisfaction of *Miranda*. Accordingly, the court properly denied the motion to suppress appellant's written statements.

Moreover, even if the court erred in admitting the written admissions, any error was harmless beyond a reasonable doubt because appellant confessed to the shoplifting before Officer Bush arrived. *See State v. Logan*, 394 Md. 378, 388-91 (2006) (applying harmless error analysis to a *Miranda* violation but holding error was not harmless beyond a reasonable doubt); *see also Bartram v. State*, 33 Md. App. 115, 153 (1976) ("It is, of course, settled law that a *Miranda* error can, indeed, be harmless error") (citations omitted), *aff'd*, 280 Md. 616 (1977); *Cummings v. State*, 27 Md. App. 361, 385 n.5 (1975) ("That a *Miranda* violation can be harmless error is not to be doubted") (citations omitted).

Here, in addition to testifying at the motions hearing that appellant confessed before Officer Bush arrived at trial, Salley was asked on direct examination, "beyond the signed statements, did [appellant] admit to stealing the items from Macy's?" Salley testified, without objection, "Yes." We hold that any error in suppressing the written statements was harmless beyond a reasonable doubt given that the jury heard evidence of

21

appellant's confession, without objection. *See State v. Guidry*, 496 So. 2d 650, 653 (La. Ct. App. 1986) (even assuming *arguendo* that a private security guard was acting as a law enforcement agent, the defendant's statement, "I'm guilty," was unsolicited and voluntary); *Sandone v. State*, 394 S.W.3d 788, 794 (Tex. App. 2013) (concluding that any error in admitting testimony about statements defendant gave to store's loss prevention officer was harmless where another witness testified to the same facts without objection).

## II.

Appellant next asserts that the circuit court erred in allowing Salley to narrate the events depicted in the surveillance video. Appellant's claim in this Court is that Salley offered improper lay opinion. The State responds that the issue was not properly preserved because these grounds were not raised in court, and that the issue is without merit in any event.

Prior to hearing any specific testimony about the surveillance video recording of the incident, defense counsel objected on the grounds that there was no foundation for the video. A bench conference ensued as follows:

> [DEFENSE COUNSEL]: (Indiscernible) any type of CD, any information to determine how it gets recorded, whether or not she did it. The foundation element is just not there at this point, Your Honor.

> [PROSECUTOR]: I'm not offering it for (indiscernible) right now. The objection is premature.

> THE COURT: And, can I ask you, is this the original CD or is this one that was made from the security system at the store?

> [PROSECUTOR]: Can we ask the witness that, Your Honor?

THE COURT: Okay. I just – if it's not the original then I'd like to know who created it and how they did that and if the program that they used is reliable.

[PROSECUTOR]: Okay.

Subsequently, Salley testified that the video was recorded and kept in the ordinary course of business for Macy's, that she was a custodian of records for the store, that she watched the video in question, and that this video was consistent with what she personally observed on the day in question. When asked whether defense counsel wanted to conduct any further *voir dire*, counsel declined, stating "I believe the foundation requirements have been fulfilled." The video was thereafter admitted into evidence without objection.

The State then received permission to publish the video to the jury. Just prior to playing the video, the following ensued:

BY [PROSECUTOR]:

Q. Now, Ms. Salley, I'm going to play the recording that's already in evidence as State's. Explain to the jurors what's going on with the contents of this video.

[DEFENSE COUNSEL]: Your Honor, objection as to the – I'm not sure who their (several words indiscernible) cameras that have recorded. Just as to completeness, Your Honor.

THE COURT: Would you approach?

[DEFENSE COUNSEL]: Yes.

* * *

BENCH CONFERENCE

(Counsel and defendant approached the bench and the following occurred.)

23

THE COURT: Will they play all three at the same time?

[PROSECUTOR]: No.

[DEFENSE COUNSEL]: Okay, I just wanted to make sure.

THE COURT: Just one at a time?

[PROSECUTOR]: Just one at a time.

THE COURT: Okay.

\* \* \*

BENCH CONFERENCE ENDS

Direct examination of Salley proceeded as the video played in open court:

BY [PROSECUTOR]:

Q. Now, Ms. Salley, please explain to the jurors what's going on in content of these recordings, please.

A. The part that you're viewing right now is a video of the gentleman with the red shirt and the camouflage pants. Pretty much what I do on a daily basis, I come in and I scan the whole store until I see something that I want to – something that looks out of the ordinary, something odd.

There's the gentleman in the red shirt and camouflage pants. He's walking into the women's coat department. And I start to begin to pan my camera over to the right and when I zoomed it all the way up, he meets up with the three ladies, one being Labria Paige.

I stay with him for a little while longer.

[DEFENSE COUNSEL]: Your Honor, I don't believe a question has been asked.

[PROSECUTOR]: I asked her to detail what's in the contents of the recording.

24

THE COURT: I'll allow it.

Salley was then asked by the State to continue providing detail as the video played for the jury. At several points while the video played, the State fast forwarded through the video, and defense counsel expressly stated that he had no objection so long as the video could be observed during that fast forwarding.

Salley continued to testify, still without objection, that she saw appellant and the two other juveniles on the video as they stood together with the unidentified man. She testified as to another point in time when the three were observed on the video talking on cellphones and making selections in the women's department. Salley testified, again without objection, that she saw appellant in the video on the "top of the screen on the right." Salley testified further that appellant could be seen on the video on the "left side of the screen," carrying a pair of black Nike jogging pants. She also testified, without objection, to scenes during the video when: appellant was observed selecting a black and white athletic t-shirt; making more selections in the store, and then walking over to the fitting room and looking for an empty stall. Salley further stated, without objection, that the three individuals went into a stall together. The video then depicted the moment in time when Salley, herself, entered an adjacent stall in order to continue her surveillance from the store floor. Salley maintained that the video had not been altered or disturbed in any way, and that she was able to see appellant throughout the course of that video recording.

Salley then testified as follows on further direct examination:

Q. Now, please detail for us once again what's in the recording.

25

A. Right now the recording shows the gentleman come back to the stall with the three women that stall together [sic]. He called out to them. He waited outside for them and they all came out, all three of the women came out.

Q. Now, what are the things they came out with?

A. I'm sorry?

Q. What did they come out with?

A. They came out with two athletic shirts, another pair of sweatpants or leggings and they carried that stuff and put it down.

Q. Now, as you can see – well, what is Ms. Paige carrying?

A. Right now, Ms. Paige is carrying a teal-colored dress that she just selected off the rack.

Q. Okay, and what about the other two that are behind her, what are they carrying?

A. The one in the ball cap is carrying the now full Downtown Locker Room bag and the black bag.

Q. Okay, now you said it's full. Why do you describe it as full?

A. Because the size of the bag prior to them going into that stall was not as big as it is now. And secondly –

[DEFENSE COUNSEL]: Objection.

THE COURT: No, I'll allow it. Overruled.

BY [PROSECUTOR]:

Q. And secondly?

A. And secondly, my job is to verify and identify anything that was left in the stall after they walked out of the stall.

Salley explained that appellant originally entered the stall carrying six items. After she inspected the stall, Salley determined that "[f]our of the items that stood out to us during their selection were not in the stall at all." Two items remained behind, according to Salley.

Salley continued testifying about a second camera view of the incident, again without objection. Salley explained that the second recording offered "[d]ifferent angles" that showed "different people making selections." She provided details from that recording including, but not limited to, views of: appellant and her two female companions; appellant selecting a yellow shirt from the Nike section of the athletic area of the women's department; one of appellant's companions with the Downtown Locker Room bag; and, a picture of both the outside of the stall where all three had entered with merchandise, and an area in the fitting room just outside that same stall.

Salley also testified there was a third view of the encounter, and that view displayed similar scenes of appellant and the two juveniles congregating together throughout the store and entering and exiting the fitting room stall together. Salley testified, without objection, that a portion of the recording showed the three individuals exiting the store without paying for the merchandise.

Considering this record, we begin with Md. Rule 8-131(a), which provides, in pertinent part:

> Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

27

Additionally, Md. Rule 4-323(a) provides, again in pertinent part:

> An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly . . . .

The purposes of these rules are:

> "(a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and (b) to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation."

*Fitzgerald v. State*, 384 Md. 484, 505 (2004) (quoting *County Council v. Offen*, 334 Md. 499, 509 (1994)); *accord Robinson v. State*, 404 Md. 208, 216-17 (2008); *see also Conyers v. State*, 354 Md. 132, 149-50 (1999) (relying on Md. Rule 4-323 which describes the proper method for making objections at trial).

In addition, "[i]t is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal." *Klauenberg v. State*, 355 Md. 528, 541 (1999) (citations omitted); *see also Gutierrez v. State*, 423 Md. 476, 488 (2011) (reiterating that "when an objector sets forth the specific grounds for his objection . . . the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified") (citation omitted); *Robinson v. State*, 209 Md. App. 174, 202 (2012) ("Because [appellant's] arguments were not raised below, they are not preserved for appellate review").

28

As indicated in our discussion, although there were various points during Salley's testimony when defense counsel raised certain objections to certain testimony, at no time did defense counsel ever specifically contend that Salley's testimony amounted to improper lay opinion. We ordinarily would conclude that this issue is not preserved due to the overall absence of specific objections to Salley's testimony on the grounds raised for the first time on appeal.

However, there was one instance where counsel raised a general objection. Pursuant to Md. Rule 4-323(a), if a party appeals a trial court's ruling on a "general" objection to the admission of evidence, then that party is free to "argue *any* ground against its inadmissibility." *See Johnson v. State*, 408 Md. 204, 223 (2009) (citations omitted) (emphasis in original); *accord Wilder v. State*, 191 Md. App. 319, 355 (2010).

When Salley testified to that part of the video concerning the appearance of the Downtown Locker Room bag, defense counsel offered a general objection as follows:

> Q. Okay, now you said it's full. *Why do you describe it as full*?
>
> A. Because the size of the bag prior to them going into that stall was not as big as it is now. And secondly –
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: No, I'll allow it. Overruled.
>
> BY [PROSECUTOR]:
>
> Q. And secondly?
>
> A. And secondly, my job is to verify and identify anything that was left in the stall after they walked out of the stall.

(Emphasis added).

Ordinarily, this would be sufficient to preserve appellant's argument, at least to the extent that it challenged Salley's testimony about the size of this particular bag.[7] And yet, despite this general objection, we conclude that any challenge to Salley's opinion was waived. This is so because Salley offered a similar opinion later during direct examination, without objection, when she testified that the video showed the Downtown Locker Room bag when it was smaller and then later again, when it was larger. Specifically:

> Q. And you mentioned earlier the bag was a smaller, sort of, state at this time. Was that the state you were talking about?
>
> A. Yes.
>
> Q. And when you will see this again, in this recording, will it be smaller, the same or larger?
>
> A. Larger.

In *Yates v. State*, 429 Md. 112, 120-21 (2012), the Court of Appeals stated: "[w]here competent evidence of a matter is received, no prejudice is sustained where other objected to evidence of the same matter is also received." (Citation and internal quotation marks omitted); *see also DeLeon v. State*, 407 Md. 16, 30-31 (2008) (holding that a defendant waived an objection to what he claimed was irrelevant and highly prejudicial testimony about his purported gang affiliation because "evidence on the same

---

[7] Salley's testimony that her job required her to "verify and identify" items left behind is arguably a statement of fact, not opinion. *See Thomas v. State*, 183 Md. App. 152, 178 (2008) ("An opinion is a belief or view base on an interpretation of observed facts and experience") (citation omitted), *aff'd*, 413 Md. 247 (2010).

point [was] admitted without objection" elsewhere at trial). Although defense counsel's general objection initially preserved a challenge to Salley's direct examination offering an opinion about the relative appearance of the Downtown Locker Room bag, that objection was waived when similar testimony came in later without objection. Accordingly, we are persuaded that this issue is not preserved for appellate review.

Even if preserved, we conclude that appellant's claim is without merit. "We review a circuit court's decisions to admit or exclude evidence applying an abuse of discretion standard" *Norwood v. State*, 222 Md. App. 620, 642 (citing *Kelly v. State*, 392 Md. 511, 530 (2006)), *cert. denied*, 444 Md. 640 (2015); *see also Warren v. State*, 164 Md. App. 153, 166 (2005) ("The decision to admit lay opinion testimony is vested within the sound discretion of the trial judge") (citation omitted). We have previously explained:

> "'[A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.'" *Alexis v. State*, 437 Md. 457, 478 (2014) (emphasis omitted) (quoting *North v. North*, 102 Md. App. 1, 14 (1994)). "Rather, '[a] court's decision is an abuse of discretion when it is well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Id.* (quoting *Gray v. State*, 388 Md. 366, 383 (2005) (quoting *Dehn v. Edgecombe*, 384 Md. 606, 628 (2005)) (some internal quotation marks omitted)).

*Id.* at 643.

Pursuant to the Maryland Rules of Evidence, a lay witness may testify to those opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Md. Rule 5-701. "The rationale for the standard set by [Md.] Rule 5-701

31

is two-fold: the evidence must be probative; in order to be probative, the evidence must be rationally based and premised on the personal knowledge of the witness." *State v. Payne*, 440 Md. 680, 698 (2014) (citation and footnote omitted); *see also* Md. Rule 5-602 (a witness must have personal knowledge of the matter, and "[e]vidence to prove personal knowledge may, but need not, consist of the witness's own testimony"). And:

> The personal knowledge prerequisite requires that "'[e]ven if a witness has perceived a matter with his senses,'" he must also have "'the experience necessary to comprehend his perceptions.'" The rational connection prerequisite requires that there "'be rational connection between th[e] perception and the opinion.'"

*Rosenberg v. State*, 129 Md. App. 221, 255-56 (1999) (quoting *Robinson v. State*, 348 Md. 104, 121, 124 (1997)).

The issue presented concerns admission of Salley's opinions. By way of background information, Salley had been employed as a loss prevention officer at Macy's for six years. During that time, she attended yearly training sessions that taught her how to apprehend, escort, and detain individuals suspected of shoplifting. She testified that there were five "steps" that a loss prevention officer needed to observe prior to making an apprehension, and those steps were "entry, selection, continuous observation, concealment and exit." Her job at Macy's required her to view 97 closed circuit televisions throughout the entirety of the store, except for the restrooms, the stalls inside the fitting rooms, and the employee lounge.

On April 14, 2013, Salley was working in the Columbia Mall Macy's when she personally watched appellant, from the moment appellant first appeared in the women's department until she exited the door. Pertinent to this issue, Salley testified that she had

32

reviewed the video prior to trial, and that the information recorded on the CD was a fair and accurate depiction of what transpired on the day in question. Macy's retained videos such as these in the ordinary course of business, and Salley agreed that she was a custodian of the specific video that was recorded in connection with this case.

Thereafter, during the playing of the recording, it was apparent that Salley had operated the surveillance cameras on the day in question. She testified that, at one point, she switched cameras while following the man and zoomed in on his movements as he approached the three individuals. Salley indicated there were three monitors that showed the different angles, and the video used the one monitor that focused on appellant and the two juveniles. She explained that she could move from one camera to any one of the 97 cameras at her disposal during the recording process by pressing a number associated with an individual camera feed. Salley further testified that there were 6 cameras in the athletic and couture section[2] of the women's department. Some of these 6 cameras were located over the registers, some were covert cameras, and some were inside black bubbles on the ceilings. Salley stated that these cameras could catch people stealing and could be used to exonerate those individuals.

We are persuaded that Salley's testimony, offering a narrative that described the events in the surveillance video, was based on Salley's personal knowledge of the events that unfolded. To the extent that Salley went beyond testifying to mere facts, any opinions she offered, including the opinion about the change in size of the Downtown

---

[2] Couture clothing are garments created or produced by a fashion designer.

Locker Room bag after appellant entered the fitting room stall with the two juveniles, were rationally based on her perception. We also conclude that the testimony, based as it was on Salley's six-year experience as a loss prevention agent, was helpful to a clear understanding of Salley's testimony and the determination of whether appellant knew about the shoplifting.

In support of her argument, appellant cites *Moreland v. State*, 207 Md. App. 563 (2012). We conclude that *Moreland* actually supports our decision. In that case, we decided that the lay witness testimony of a non-eyewitness police officer was "helpful" to the jury, and therefore, admissible because the officer had sufficient "substantial familiarity" with the defendant. *Id.* at 572-73; *see also Tobias v. State*, 37 Md. App. 605, 616-17 (1977) ("We find no abuse of discretion in allowing the authenticating witness to identify the people shown in the video tape . . . . The jury saw the tape, and could judge for itself what it showed and whether Detective Battle's identifications were accurate"). Likewise, Salley, who actually was an eyewitness to the events discussed herein, offered helpful testimony that was probative on the issue of criminal responsibility.

We find additional support in *Cuzick v. Commonwealth*, 276 S.W.3d 260, 266 (Ky. 2009). In *Cuzick*, Officer Bradley Sapp was driving his marked police vehicle when he encountered Cuzick, who was driving the wrong way on a Kentucky roadway. *Id.* at 262. After activating his emergency equipment and turning around to pursue Cuzick, Officer Sapp stopped appellant momentarily. *Id.* However, while the officer approached Cuzick's vehicle on foot, Cuzick sped away from the traffic stop, again into oncoming traffic. *Id.* Officer Sapp resumed pursuit and, eventually accompanied by Officer Jason

34

Faddasio and Corporal Michael Fleming, a high speed chase, reaching speeds in excess of 85 miles per hour, ensued. *Id.* Appellant's vehicle soon thereafter failed, and appellant was apprehended, charged, and convicted of multiple counts, including fleeing and evading police and resisting arrest. *Id.*

At trial, both Officer Sapp and Corporal Fleming testified to the events in question. *Cuzick*, 276 S.W.3d at 265. During their respective testimonies, a video of that pursuit was played for the jury. In response to questioning, both officers described the images on that video as it related to their perspective of the underlying events. *Id.* An issue presented on appeal concerned admission of the officers's narrative that accompanied playing of the video recording. *Id.* at 264-65. In its discussion, the Supreme Court of Kentucky noted that it had previously addressed the issue of whether a police officer's narrative testimony during the playing of a crime scene video was improper lay testimony. *Id.* at 265. The Court had determined that the relevant test was whether the testimony complied with the Kentucky Rules of Evidence, more specifically, Kentucky Rule of Evidence ("KRE") 701, governing lay opinion testimony and KRE Rule 602, concerning the requirement that testimony be based on personal knowledge. *Id.* (citing *Mills v. Commonwealth*, 996 S.W.2d 473 (Ky. 1999)). *Compare Milburn v. Commonwealth*, 788 S.W.2d 253, 257 (Ky. 1989) (allowing narrative testimony from in court witnesses providing "simultaneous commentary" of crime scene video), with *Fields*

*v. Commonwealth*, 12 S.W.3d 275, 280 (Ky. 2000) (finding error in pre-recorded narrative video when such narration contained inadmissible hearsay).[8]

The Court stated that "the fulcrum of the matter upon which this issue turns, is whether the witness has testified from personal knowledge and rational observation of events perceived and whether such information is helpful to the jury. In short, does the testimony comply with the rules of evidence?" *Cuzick*, 276 S.W.3d at 265. The Court held that "[w]hile a witness may proffer narrative testimony within the permissible

---

[8] The Kentucky Rules of Evidence are substantially similar to their Maryland counterparts:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> > (a) Rationally based on the perception of the witness;
> >
> > (b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and
> >
> > (c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

KRE 701.

> And:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of KRE 703, relating to opinion testimony by expert witnesses.

KRE 602.

36

confines of the rules of evidence, we have held he may not "interpret" audio or video evidence, as such testimony invades the province of the jury, whose job is to make determinations of fact based upon the evidence." *Id.* at 265-66.

Applying this test to the facts, the Supreme Court of Kentucky upheld the admission of the officers's narration:

> Here, the videos in question depicted the substance of a high-speed police chase, as captured from the in-car cameras. It is completely reasonable to conclude that the officers' testimony was not only beneficial to the jury in discerning what was happening on the video, but was in all likelihood necessary. Moreover, and importantly, the officers' testimony did not interpret the video. While the testimony was narrative in the sense that it sequentially followed the chronology of the tape, all statements were responsive in nature and were in answer to the Commonwealth's questions. Narrative testimony is not necessarily interpretive testimony *per se.* Here, the testimony was explicative of the officers' perception of the events occurring on the video as they perceived them during the police chase and provided further elucidation of matters of police procedure, etc., which were not readily identifiable from the video standing on its own. Thus, having reviewed the record and determined that the testimony was proper lay opinion testimony which was beneficial to the jury, we find no palpable error.

*Id.* at 266 (internal citations omitted); *see also State v. Buie*, 671 S.E.2d 351, 356 (N.C. App. 2009) (noting cases where the Court had upheld admission of opinion testimony narrating events in a surveillance video "when their interpretations were based in part on firsthand observations"); *People v. Hardy*, 981 N.Y.S.2d 722, 723 (N.Y. App. Div. 2014) ("[I]t was permissible for the witnesses to explain matters depicted on the videotapes that they had personally participated in or observed"), *leave to appeal denied*, 17 N.E.3d 506 (N.Y. 2014).

In sum, and to the extent preserved, Salley's testimony in this case was based on her personal knowledge from having witnessed appellant's actions, real time, as appellant moved through the women's department at Macy's. That testimony explained facts on the video, including appellant's selection of various items, the conference of appellant and the two juveniles in one fitting room stall, and then the exit from the store without paying, while one of appellant's companions carried a "full" Downtown Locker Room bag. To the extent that Salley offered opinions about these events, including that the bag looked larger after emerging from the crowded fitting room stall than when the appellant entered, we conclude that the testimony was rationally based on Salley's perceptions and were helpful for the jury to understand facts at issue.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**